[redacted]

**UNITED STATES of America; the State of New York, and UDC–Love Canal, Inc., Plaintiffs,**

**v.**

**HOOKER CHEMICALS & PLASTICS CORPORATION, et al., Defendants.**

**No. CIV–79–990C.**

United States District Court,
W.D. New York.

Sept. 26, 1988.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

U.S. Dept. of Justice, Environmental Enforcement Section, Land and Natural Resources Div. (Bruce S. Gelber, of counsel), Washington, D.C., and Robert Abrams, Atty. Gen. of State of N.Y. (Eugene Martin–Leff, of counsel), New York City, for plaintiffs.

Piper & Marbury (Thomas H. Truitt, of counsel), Washington, D.C., for defendant Hooker Chemical & Plastics Corp.

Gellman, Brydges & Schroff (Earl W. Brydges, Jr., of counsel), Niagara Falls, N.Y., for defendant City of Niagara Falls.

Phelps, Gray & Hewitt (James P. Hewitt, III, of counsel), Niagara Falls, N.Y., for defendant Bd. of Educ., City of Niagara Falls.

Hurwitz & Fine (Theodore J. Burns, of counsel), Buffalo, N.Y., for defendant Niagara County.

CURTIN, Chief Judge.

In a ruling dated April 30, 1988, Special Master John E. Sexton held that a "mental processes" privilege is applicable in this case with respect to deposition testimony as to the unwritten, uncommunicated mental activities of certain administrative decisionmakers. The Master went on to hold, however, that in a context such as the instant one where judicial review of an administrative decision is not at issue, the privilege is defined by the parameters of the "deliberative" privilege, and thus does not protect the decisionmaker's final, *i.e.*, post-decisional, unwritten or uncommunicated views. Ruling of the Special Master on the Mental Processes Privilege [Ruling], Item 644, pp. 42–43. [Editor's Note: Item 644 is attached as an appendix.] Pursuant to ¶ 6 of the Case Management and Discovery Order (Item 507), the State has filed its objections to the Ruling (Item 676), and requests that the court reject the Master's recommendations inasmuch as they conflict with established principles of privilege law. The United States has filed a response in support of the State's objections (Item 702). Occidental Chemical Corporation [OCC] has filed its memorandum in support of the Ruling (Item 696). Due to the importance of the issues addressed in the Ruling, oral argument was heard by the court on July 22, 1988.

In order to fully comprehend the meaning and scope of the Ruling, and to establish a relevant context for the reasoning set forth below in this order, it is important to briefly discuss the background of this complex litigation. The controversy in this case centers around activity at the area in Niagara Falls, New York, known as the Love Canal,[1] which is a 16-acre landfill site into which OCC deposited more than 21,000 tons of industrially produced chemical wastes between the years 1942 and 1953. The area surrounding the Love Canal site, residential in nature, became increasingly so during the 1960's and 70's, and by 1976 over 1,000 families lived within approximately 1,500 feet of the site. Meanwhile during the 1970's, several different hazardous substances were detected in the surface water, groundwater, soil, sewers, creeks, basements of homes, and other locations in the area surrounding the site. On August 2, 1978, then New York State Commissioner of Health Dr. Robert P. Whalen declared the existence of a public health emergency at Love Canal, and his successor Dr. David Axelrod continued that emergency in an order dated February 8, 1979. On May 21, 1980, President of the United States Jimmy Carter declared a national emergency at Love Canal. Both prior and subsequent to these declarations, the State and the United States funded and conducted extensive remedial activities, in-

---

1. The area is named for its original developer, William Love, who in the 1890's purchased and excavated the land on which the canal is located as part of a proposed power canal bypassing Niagara Falls. The canal, which was about 60 feet wide and 3,000 feet long, was never completed and the project was ultimately abandoned. In May, 1904, the Niagara County Irrigation and Water Supply Development Company purchased the canal, and in 1942, its successor the Niagara Power and Development Company [NPDC] entered into an agreement with Hooker Electrochemical Company [Hooker], corporate predecessor to OCC, granting Hooker permission to use the excavated area as a disposal site for chemical wastes from its Niagara Falls plant. Hooker eventually purchased the property on which the canal was located from NPDC in April, 1947, and subsequently sold the canal property to the Board of Education of the City of Niagara Falls in April, 1953. In June, 1960, the Board sold approximately 6½ acres of the northern portion of the property to the City of Niagara Falls, and in January, 1962, sold approximately 6 acres of the southern portion of the property to Ralph Capone, a New York City resident. In June, 1974, Capone sold his 6 acres to L.C. Armstrong, a resident of Pennsylvania. The remaining 3½ acres of the canal property continues to be owned by the Board. *See* Item 141 (Second Amended Complaint of Plaintiff United States), ¶¶ 14–20.

cluding various environmental and engineering studies, the relocation of residents from the Love Canal area, the demolition of homes bordering the Love Canal, and several other measures to clean up, contain and monitor chemical contaminants in and around the site.

This action was filed on December 20, 1979, by the United States, and the State of New York was joined as a plaintiff in September, 1980. For the purposes of deciding the issue now before the court, the most important claims involve OCC's responsibility under federal, state and common law for the health hazards posed by the presence and migration of the chemical wastes deposited at Love Canal, and for reimbursement of the funds spent by the governments for remedial measures made necessary by the presence of those wastes. In its defense, and as a basis for its counterclaims against the governments, OCC makes three arguments that are of particular importance to the present issue. First, OCC contends that much of the remedial work undertaken by the State was unnecessary and was performed in a way that was not cost-effective. Second, OCC contends that the State mishandled the Love Canal situation by releasing erroneous information with regard to the health risks associated with exposure to the chemicals deposited at the Love Canal. Third, OCC claims that much of the remedial action taken by the governments was necessary only because of the State's own negligence as evidenced by, for example, migration of the wastes as a result of the construction of the LaSalle Expressway over the southern end of the Canal property. According to OCC, these actions have seriously compounded the problems at Love Canal and are largely responsible for the sums of money spent to remediate those problems. *See* Item 184, pp. 2–3.

By decision and order dated February 23, 1988 (Item 610), this court granted the governments' motion for partial summary judgment under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act [CERCLA], 42 U.S.C. § 9607, finding OCC strictly, jointly,

and severally liable for remedial costs recoverable under that statute which were incurred by the governments in connection with the release and threatened release of hazardous chemicals from the Love Canal landfill, including those recoverable costs incurred prior to CERCLA's enactment. *United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. 546, 556 (W.D. N.Y.1988). Prior to that decision, the court found in its Supplemental Order # 8 (Item 452), *United States v. Hooker Chemicals & Plastics Corp.*, 114 F.R.D. 100 (W.D.N.Y.1987), that certain documents relating to the decision-making process which resulted in the State's decision to undertake remedial measures at Love Canal are not discoverable by OCC because they are subject to the deliberative privilege, which protects documents comprising part of the judicial or quasi-judicial decision- or policy-making process. This protection, however, was found by the court not to extend to those documents, in full or in part, evidencing a.) the State's concern for the possible political ramifications of the Love Canal situation, and b.) the State's consideration of possible actions in light of factors unrelated to the health and safety of those living and working in the Love Canal area. 114 F.R.D. at 103. According to OCC, costs properly connected with these latter considerations (*i.e.*, political ramifications and factors unrelated to health and safety) should not be recoverable under CERCLA's statutory scheme.

Essentially, the discovery dispute which necessitated the Master's Ruling now at issue is an extension of the dispute which spawned Supplemental Order # 8. During the depositions of Drs. Whelan and Axelrod, the administrative officials responsible for the State's decision to declare a public health emergency at Love Canal, OCC sought information, deemed crucial to its defenses and counterclaims, as to how that decision was made, *i.e.*, whether considerations other than those related to health and safety were taken into account during the decision-making process. Attorneys for the State directed the witnesses not to an-

**6**

swer certain questions[2] posed by OCC on the grounds that the testimony sought was privileged information. Item 644, pp. 12–14. At the request of the parties, the Master[3] received briefs and held two days of oral argument. *Id.*, p. 14. The State argued that a state official's thoughts or opinions on policy matters, if communicated to others engaged in governmental deliberations, are protected by the intragovernmental deliberative privilege, and even if not communicated, are protected by the mental processes privilege. *Id.*, pp. 14, 16. In addressing this argument, the Master traced the development of the mental processes privilege to the Supreme Court's decision in *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941),[4] and found that the rules generated by *Morgan* and its progeny[5] regarding that privilege, in their purest form,

> must be understood in the special context that spawned them. So, when we say that the *Morgan* privilege (or doctrine) applies to "administrative decisions," we do not mean that it applies to every

decision made by a government official; rather, we mean that it applies to the decisions made by government officials which, as a matter of Administrative Law, are subject to judicial review of one form or another.

Item 644, p. 23. As the Master noted, the instant case is not within the same "judicial review paradigm" that generated the *Morgan* privilege, since "no agency or governmental action is 'under review' in any Administrative Law sense of that phrase." *Id.*, p. 27. Thus, in seeking a justification for applying the mental processes privilege in the present context, the Master focused his inquiry on whether, "in cases where judicial review of administrative action is not the issue, courts should or should not probe the mental processes of government officials *depending upon* whether the rationales which spawned the mental processes privilege in the judicial review paradigm (or new considerations) justify its application." *Id.*, p. 36 (emphasis in original).[6] Of particular importance

2. In all, the parties submitted 40 "Items" to the Master for resolution, some of which contained more than one question. *See* Item 644, pp. 43–45; Item 644(b), p. 46.

3. John E. Sexton, Esq., of the New York University School of Law, was named as Special Master by order of this court dated June 18, 1987 (Supp. Order # 12, Item 498), to resolve discovery disputes, including disputes as to assertion of privilege, referred to him pursuant to the Case Management and Discovery Order [CMDO] (Item 507, as revised by Item 721). Thus far in this litigation, the Master has reviewed *in camera* over 2,000 documents as to which the State has claimed the deliberative privilege applies, and has issued three reports on those documents (Items 521, 585, 712). The Master has also issued several rulings regarding disputes which arose during deposition questioning (Items 562, 571, 589), including the Ruling at issue here regarding the mental processes privilege (Item 644). Still pending before the Special Master at this juncture are two disputes referred by order dated June 29, 1988 (Item 706) regarding risk assessment evidence and designation of certain witnesses.

4. As the Ruling points out, the *Morgan* case reached the Supreme Court four different times: *Morgan I*, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); *Morgan II*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); *Morgan III*, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939), and *Morgan*

*IV*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

5. The Master discussed, and carefully considered, three pre-*Morgan* cases frequently cited by courts dealing with the mental processes privilege. *See Chicago, Burlington & Quincy Railway Co. v. Babcock*, 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636 (1907); *Fayerweather v. Ritch*, 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904); *DeCambra v. Rogers*, 189 U.S. 119, 23 S.Ct. 519, 47 L.Ed. 734 (1903). The Master then cited several cases decided subsequent to *Morgan* which have relied on the mental processes rule

> in upholding the use of hearing examiners to develop evidence and form preliminary decisions, in approving the reliance on staff assistants for recommendations and draft opinions, and in authorizing a variety of other procedures designed to apprise administrative decisionmakers of critical issues and evidence. Concomitantly, courts have refused to issue subpoenas for the staff memos, expert reports, and preliminary drafts produced for these purposes; and they have refused to order the oral testimony of the decisionmaker regarding the basis of his or her decision.

Item 644, p. 20 & nn. 32–35; *see* cases cited therein.

6. The Master carefully considered, and distinguished, several cases cited by the State in support of its argument that the mental processes

to the Master was the fact "that there are literally dozens of litigation contexts wherein courts and litigants routinely examine the mental processes of government officials" *(id.,* p. 34), most notably in situations requiring revelation of the decisionmakers' motives for their decisions. For example, in *Mt. Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a non-tenured teacher claimed that the Board's decision not to rehire him was made as a result of an exercise of his First Amendment rights regarding a school dress policy. The Supreme Court held that once the plaintiff has established that his constitutionally protected conduct was a "substantial" or "motivating" factor in the Board's decision, the burden shifts to the Board to demonstrate that it would have reached the same employment decision even in the absence of improper motive. *Id.* at 287, 97 S.Ct. at 576. While not within the same litigation context as the instant case, the Master found the reasoning employed in the *Mt. Healthy* case, and in several others which have subsequently applied the *Mt. Healthy* standards,[7] persuasive.

The Master then examined several possible justifications for applying the "pure" *Morgan*-type privilege outside of the judicial review paradigm,[8] and found that the strongest rationale for extending that privi-

lege to cases such as the instant one is the existence of the deliberative privilege itself. *Id.,* p. 41. According to the Master's reading of the relevant cases, the mental processes privilege is "inextricably intertwined, both in purpose and objective" with the deliberative privilege. *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 326 (D.D.C.1966), *aff'd per curiam,* 384 F.2d 979 (D.D.Cir.), *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). "Each rule complements the other, and in combination they operate to preserve the integrity of the deliberative process itself." *Id.*

> Given that the deliberative privilege has been recognized as necessary for effective government, and given that the deliberative privilege clearly applies in cases (like the one at hand) in which judicial review of administrative action is not the issue, if it is so that the mental processes privilege is a necessary complement to the deliberative privilege in such cases, then the mental processes privilege should apply in such cases. I believe that the mental processes privilege is justified on this ground.

Item 644, p. 42.

In so finding, the Master also found the scope and application of the mental processes privilege coextensive with the scope and application of the deliberative privi-

---

privilege should apply in full outside the judicial review paradigm. *See, e.g., Babcock,* 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636; *Rogers,* 189 U.S. 119, 23 S.Ct. 519, 47 L.Ed. 734; *Bacon v. Dept. of Housing and Urban Development,* 757 F.2d 265, 269 (Fed.Cir.1985); *Proffit v. Wainwright,* 685 F.2d 1227 (11th Cir.1982); *Montgomery Ward v. Zenith Radio Corp.,* 673 F.2d 1254 (Ct.Customs & Patent App.1982); *Kent Corp. v. NLRB,* 530 F.2d 612 (5th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976); *Warren Bank v. Camp,* 396 F.2d 52 (6th Cir.1968); *Morrison v. Kimmelman,* 650 F.Supp. 801 (D.N.J.1986); *Feller v. Bd. of Education,* 583 F.Supp. 1526 (D.Conn.1984); *Brownko Int'l v. Ogden Steel Co.,* 585 F.Supp. 1432 (S.D.N.Y.1983); *Tenneco Oil Co. v. Dept. of Energy,* 475 F.Supp. 299 (D.Del.1979).

7. *See, e.g., De Choudens v. Government Development Bank of Puerto Rico,* 801 F.2d 5, 7 (1st Cir.1986); *Jett v. Dallas Independent School District,* 798 F.2d 748, 758 (5th Cir.1986); *Jones v.*

*Dodson,* 727 F.2d 1329, 1332 (4th Cir.1984); *Ayers v. Western Line Consolidated School District,* 691 F.2d 766, 768–69 (5th Cir.1982); *Avery v. Homewood City Board of Education,* 674 F.2d 337, 341 (5th Cir.1982); *see also Jefferson v. Hackney,* 406 U.S. 535, 547, 92 S.Ct. 1724, 1732, 32 L.Ed.2d 285 (1972).

8. The (sometimes overlapping) rationales for applying the privilege outside of the judicial review paradigm which were examined, and ultimately rejected, by the Master include: (a) discouraging officials whose decisions are under review from testifying about those decisions (Item 644, p. 37); (b) judicial efficiency in maintaining a balance between administrators and courts *(id.);* (c) encouraging healthy decisionmaking by not requiring the official to expose changes of position *(id.,* pp. 38–39); (d) protecting the decisionmaker's relationship to others in the deliberative unit *(id.,* pp. 39–40), and (e) maintaining institutional integrity.

lege. *Id.* That scope has already been defined by this court in Supplemental Order # 8:

> Generally speaking, the deliberative privilege applies to all material reflecting the actual pre-decisional, mental, or deliberative process—inter- and intra-governmental evaluations, expressions of opinion, and recommendations on policy and decision-making matters. However, it does not apply to post-decisional, or so-called "working law communications," *i.e.*, explanations or interpretations of an existing government decision. The deliberative privilege also does not apply to 1) purely factual material or data which may be severed from a given deliberative memorandum or report, or 2) material which evaluates the implementation of a given government decision.

114 F.R.D. at 102. Also excepted from the privilege, though falling within its scope, is any material which

> ... explicitly evidences the State's concern for the possible political ramifications (or other factors unrelated to the health and safety of those living or working near Love Canal) and which suggests various actions in light of these political ramifications (or other factors unrelated to the health and safety of those living or working near Love Canal).

Item 644, p. 43; *see also* 114 F.R.D. at 103. The Master thus embraced the policy that, while applicable (to a degree) to the instant case, the mental processes privilege protects the decisionmaker's thought processes only to the extent necessary to promote the interchange of ideas prior to a final decision; it does not preclude inquiry as to the decisionmaker's opinions about his or her decision after that decision has been made.

> It is well settled that the deliberative privilege does not protect the product of the deliberative process—the decision. So also the mental processes privilege does not protect that product.... At the point where the deliberative process comes to an end, the protection of both privileges comes to an end.... The same concept can be put another way. At a certain point, when the decisionmak-

er comes to rest, the decisionmaking process comes to an end. The decisionmaker's views at that point are his final position. It makes no difference whether those views are written or unwritten.

Item 644, p. 42. The Master further recognized the qualified nature of the mental processes privilege and the balance that must be struck in determining whether material concededly within the scope of the privilege should be disclosed in a given case. *Id.*, p. 43.

With the above announced principles to guide him, the Master proceeded to evaluate each of the instances thus far presented in which the State has invoked the mental processes and/or deliberative privilege during the course of the depositions of Doctors Axelrod and Whalen. Item 644, pp. 43–45; *see also* Item 644(b) (Appendix attached to the Ruling). In some cases where the mental processes or deliberative privileges were found to apply (or appeared to apply), the State was required to submit proof identifying for the specific instance at issue the decision which was the product of the deliberative process creating the claim of privilege, the deponent's role in that process, and the substance of the deponent's testimony. Item 644, p. 43. After receiving and considering those submissions, the Master issued a Supplemental Ruling, dated May 25, 1988, which either confirmed or denied application for each of the instances at issue. Item 668, p. 60 [Editor's Note: Item 668 is attached as an appendix].

It is in the context of these individual determinations as to the applicability of the privilege in specific instances that the scope and meaning of the Special Master's Ruling comes into focus. In each instance, the Master carefully considered the State's claim of privilege in conjunction with the principles embodied in the Federal Rules of Evidence, the Federal Rules of Civil Procedure, and the law of the case, and struck the proper balance between protection of the deliberative process and full disclosure of relevant evidence. Accordingly, in 11 of the 40 instances considered, the Master found that the mental processes/delibera-

tive privilege foreclosed questioning by OCC as to pre-decisional thoughts, opinions, facts, or other information or material involved in the deliberative process. Where the privilege was found not to apply, the Master held that the questions posed sought the decisionmaker's final, unwritten views or his present opinion as to pre-decisional matters, sought merely factual material, or were irrelevant. *See* Item 644, pp. 43–45; *see also* Items 644(b), p. 46, 668 p. 60.

In objection to the Ruling, the State contends that the relevant caselaw establishes a much broader protection of the mental processes of administrative decisionmakers than that found to exist by the Master. Item 676, pp. 4–9. According to the State, the mental processes privilege as delineated in the judicial review setting has been applied with the same scope outside that setting. That privilege, the State further argues, not only protects those thoughts and opinions formulated by the official prior to his or her decision, but also precludes post-decisional inquiry into those mental processes. *Id.,* p. 8. The United States concurs with the State, contending that there is no legal basis for the Master's distinction in the application of the privilege between cases involving judicial review of administrative decisions and cases that do not. Item 702, p. 3. In support of the Ruling, OCC contends that the State's reliance on cases recognizing the privilege outside the judicial review context is unconvincing. Item 696, p. 6–7. According to OCC, the Master's ruling is consistent not only with established precedent, but also with public policy and the law of the instant case, as embodied in this court's supplemental order # 8 (Item 452), and should thus be affirmed. *See* Item 696, p. 17.

The State objects primarily to the Master's finding that the mental processes privilege is "coextensive" in scope with the deliberative privilege. According to the State, if such a finding is allowed to stand, not only will questions as to why an admin-

istrative official made a particular decision be tolerated, but new law will be created which is at odds with well-established precedent. Furthermore, "an invasion of the internal thought processes of high-level officials of the State of New York will occur in the absence of any finding of a compelling need for such an invasion." Item 676, p. 4. In support of its position that the mental processes privilege should apply in full force in cases where judicial review of administrative decisions is not at issue, the State relies primarily on the holdings in *Carl Zeiss; Securities and Exchange Commission v. Perera Co.,* 47 F.R. D. 535 (S.D.N.Y.1969); and *United States v. American Telephone & Telegraph Co.,* 524 F.Supp. 1381 (D.D.C.1981).[9] This latter case [*AT & T*] involved an attempt by the defendant to call as witnesses certain officials and employees of the Federal Communications Commission and the Department of Justice in order to show that it had acted reasonably in light of relevant administrative decisions and policies. After first noting that "[t]he government may not, without good reason, rely upon the testimony of FCC employees in support of its case and then, through the assertion of privilege, refuse defendants the opportunity to do the same," 524 F.Supp. at 1385 n. 12, the District Court for the District of Columbia (in an opinion written by Judge Harold Greene) refused to permit the testimony with respect to several matters, relying on *Morgan* and its progeny.

> In one such category are questions that tend to probe the mental processes of the individual members of the Federal Communications Commission, calling either for the reasons underlying various decisions of the Commission or for their understanding of what these decisions meant. These matters are part of the agency's deliberative process and as such are clearly privileged. As the Supreme Court has said, disclosure of intra-agency deliberations and advice is injurious to

9. Other cases cited by the State in support of this position include *Davis v. Braswell Motor Freight Lines, Inc.,* 363 F.2d 600 (5th Cir.1966); *Environmental Enterprises, Inc. v. U.S. Environ-* *mental Protection Agency,* 664 F.Supp. 585 (D.D. C.1987); *Amoco Production Co. v. Department of Energy,* 469 F.Supp. 236 (D.Del.1979).

the government's consultative function because it would tend to inhibit the frank and candid discussion that is necessary for an effective operation of government. 524 F.Supp. at 1386–87 (citations and footnotes omitted). As the Master points out in his Ruling, however, the mental processes/deliberative privilege, while undeniably a significant factor in the court's decision in *AT & T*, was only one of several grounds upon which that decision was based. Relevance was another such ground. The *AT & T* court reasoned that, since the FCC acts officially in its quasi-judicial capacity "only 'through the adoption of rules, orders, policy statements which reflect its views and commands'", *id.* at 1387 (citing FCC Order of September 30, 1981, ¶ 8), the subsequent testimony of an FCC Commissioner as to what he understood a particular decision to mean was irrelevant to the question whether the defendants' compliance with that decision was reasonable. In the instant case, OCC has challenged the State's reasons for taking the remedial action that it did. Motive, and not compliance, is thus at issue, and this court has already ruled in Supplemental Order # 8 that evidence of motive other than that relating to public health and safety is not privileged and is therefore discoverable and relevant. Further, the primary rationale relied upon by the *AT & T* court to justify the application of the "pure" mental processes privilege outside the judicial review paradigm, *i.e.*, promoting the "frank and candid discussion that is necessary for an effective operation of government," *id.* at 1387, was carefully considered and rejected by the Master as inadequate to justify unconditional protection of the administrative decisionmaker's uncommunicated thoughts in the context of the instant litigation. *See* Item 644, p. 37. Finally, the Master notes that the *AT & T* court relied upon a further independent rationale in extending the scope of the privilege.

> [Q]uestioning the individual Commissioners as to the factual basis each had for the findings he supported would not be unlike examining the Commission's decision to determine whether it was sup-

ported by substantial evidence. Such an inquiry is a matter for the court charged by statute with the review of final FCC action ... and is not within the jurisdiction of this Court.

*Id.* at 1388. In other words, "a litigant should not be permitted to do collaterally what he could not have done directly." Item 644, p. 32. The Master correctly points out, however, that while this point "adds a new twist to the debate," *id.* p. 32, it adds no explanation as to why the mental processes of a decisionmaker should not be probed in a case where that information is relevant "simply because those mental processes could not be probed on judicial review of the decision." *Id.*

The State also relies on *Securities and Exchange Commission v. Perera Co.*, 47 F.R.D. 535 (S.D.N.Y.1969), another case outside the judicial review paradigm, in which the defendant company sought to depose a Securities and Exchange Commission official responsible for the distribution of an allegedly deceitful publication. In ruling on the government's motion for a protective order, the court briefly discussed the prevailing rationale for the privilege claimed.

> The present motion seeks to prevent the taking of this deposition on the ground that it represents an unlawful attempt to explore the mental processes of a governmental official, which information falls within the protective confines of the "executive privilege."
>
> In the interest of promoting the free and candid interchange of ideas as a means to achieving effective executive decisions, it is generally not in the public interest to compel the Government to disclose its prefatory thinking as evidenced by intra-agency advisory opinions ... unless it is perfectly clear to the court that the production of such documents is essential to the proper presentation of the movant's case. The competing interests must be carefully weighed.

47 F.R.D. at 537 (citations omitted). As the Master recognizes, this "discussion of the rationale underlying the privilege highlights the necessity of promoting an *ex-*

*change* of ideas—the rationale for the deliberative privilege", Item 644, p. 30 (emphasis in original), and the brief reference to "mental processes" (which represents the court's entire discussion of the issue) does nothing to "advance an inquiry into what the scope of the mental processes privilege should be." *Id.*

*Carl Zeiss* offers the most compelling support for the State's position here. That case involved a claim of executive privilege by the United States government, not a party to the action, as to the production of inter-departmental documents relating to the government's sale of the capital stock, which had been seized during wartime, of an American distributor of a German company's products. The case is thus clearly outside the judicial review paradigm. In discussing the scope of the claimed privilege, the court found that "identically potent reasons dictate that protection no less extensive be afforded" to administrative officials than that afforded to judges from "inquisition into the elements comprising [their] decision[s]." 40 F.R.D. at 326 (*citing Morgan*, 313 U.S. at 422, 61 S.Ct. at 1004–1005). That protection encompasses both the deliberative and mental processes privileges.

> Inextricably intertwined, both in purpose and objective, are these two principles. The rule immunizing intra-governmental advice safeguards free expression by eliminating the possibility of outside examination as an inhibiting factor, but expressions assisting the reaching of a decision are part of the decision-making process. Similarly, the so-called "mental process rule" impresses the stamp of secrecy more directly upon the decision than upon the advice, but it extends to all phases of the decision-making process, of which the advice is a part. Each rule complements the other, and in combination they operate to preserve the integrity of the deliberative process itself. It is evident that to demand pre-decision data is at once to probe and imperil that process.

40 F.R.D. at 326 (citations omitted). According to the State, this language properly defines the scope of the mental processes

privilege as complementary to, rather than coextensive with, the deliberative privilege. Therefore, "the mental processes underlying or implicit in the decision itself are protected. Yet ... the Master, contrary to case law, found the thinking behind an official's final decision to be discoverable." Item 676, p. 8.

As noted in the Ruling, the reasoning in *Carl Zeiss*, while helpful to the State, does not sufficiently "explain *why* the mental processes of decisionmakers must be protected in cases where judicial review of administrative action is not the issue." Item 644, p. 29 (emphasis in original). *Carl Zeiss* involved the production of documents under a claim of privilege made by a non-party, and thus the Master is correct in distinguishing that case from the instant one in which a party to the action is claiming privilege as to the "uncommunicated cerebrations" of a decisionmaker. *Id.* In other words, *Carl Zeiss* was a deliberative privilege case, and the court's discussion of the *Morgan* mental processes rule does not advance the argument that the same justifications for protecting pre-decisional communications should apply to an administrative official's pre-decisional thoughts, or to his or her post-decisional views or opinions about those thoughts, when judicial review of that official's decision is not at issue.

 As discussed above, this court's Supplemental Order # 8 defined the parameters of the deliberative privilege within the context of the instant case, and held that the protection of that privilege does not extend to "explanations or interpretations of an existing government decision ... purely factual material or data which may be severed from a given deliberative memorandum or report, or ... material which evaluates the implementation of a given government decision." 114 F.R.D. at 102. Upon careful review of the Ruling now before the court, and upon thorough consideration of the relevant caselaw as well as general principles of discovery and relevancy, I find no compelling reason to disturb the Master's determination that the scope of the mental processes privilege applicable in this case should be defined by

those same parameters. The Ruling makes it clear that the protection afforded by that privilege to the thoughts, views, opinions or other cerebrations of the administrative officials responsible for policy decisions with regard to the Love Canal does not extend to "post-decisional . . . explanations or interpretations of" such decisions. *See* Item 452, p. 5. The Master's scholarly analysis of the caselaw reveals no persuasive justification for the type of absolute protection of the decisionmaker's predecisional mental processes urged here by the State. Furthermore, it is apparent to the court that the Master properly and correctly considered the necessary relevant factors in making his individual rulings as to each instance in which the privilege was invoked during the depositions of Drs. Axelrod and Whalen. Those factors, as set forth in Supplemental Order # 8 to be considered by the court when determining whether material that ordinarily falls within the scope of the privilege should be disclosed, include:

> 1) the relevance of the evidence [ ] to be protected; 2) the availability of other evidence; 3) the "seriousness" of the litigation and the issues involved; 4) the role of the government in the litigation; and 5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

114 F.R.D. at 102 (citing *In re Franklin National Bank Securities Litigation,* 478 F.Supp. 577, 583 (E.D.N.Y.1979). In consideration of these factors as a general matter, this court has already commented, above in this decision and in Supplemental Order # 8, on the relevance of the thoughts and opinions of the State Health Commissioners to OCC's defenses and counterclaims. With regard to the second factor, it is clear that such evidence could only be elicited from the witnesses themselves. As to factor 3, it cannot be disputed that the instant litigation is of the most serious dimensions, and that the issues presented are numerous and complex. Perhaps most importantly, the government asserting the privilege in this case is a party to the litigation. Finally, the court recognizes that affirmance of the Ruling here will have an effect, possibly a wide-ranging one, on government employees who may be forced in the future to render decisions in light of the possibility that their deliberative and mental processes might be subject to scrutiny. I do not believe, however, that that effect will be as devastating as the State would argue. Competing concerns as to the violability of the deliberative process can be adequately addressed by careful structuring of relevant questions in light of the principles set forth in the Master's Ruling and in this order, and prior orders, of the court. Further, this final factor is outweighed on balance with the other considerations mentioned above.

Accordingly, the Master's Ruling is hereby affirmed. The Master's individual rulings and supplemental rulings with regard to the specific instances in which the mental processes privilege was invoked during the course of the deposition testimony of Drs. Axelrod and Whalen, designated Items # 1 through # 40, are also affirmed.

So ordered.

## APPENDIX

### ITEM 644

### RULING OF THE SPECIAL MASTER ON THE MENTAL PROCESSES PRIVILEGE

(Filed May 2, 1988)

On January 28, 1988, I issued several rulings on disputes which had arisen during the deposition of Commissioner David Axelrod of the New York State Department of Health.[1] Chief Judge Curtin later affirmed those rulings.[2]

The main concerns of my January 28 Ruling were: the relevance of epidemiological data and quantitative risk assessment in Phase I of the ongoing discovery process, and the utility of the supplemental

---

1. January 28, 1988 Ruling of the Special Master on Deposition Questioning.

2. Supplemental Order # 22 (March 17, 1988).

discovery mechanism I developed to minimize the disputes over the boundary between Phase I and Phase II.[3]

A minor concern of my January 28 Ruling was the application of the "deliberative privilege"[4] to a single question asked of Doctor Axelrod.[5] Specifically, Doctor Axelrod was asked whether, in his view, an idea he offered for discussion in 1978—to wit, setting the acceptable risk level at zero—was a realistic proposal.[6] The State directed him not to answer on the ground that the question probed the mental processes of a participant in the decisionmaking process and that those processes are protected by the deliberative privilege. OCC moved to compel an answer.[7] In ruling that Doctor Axelrod should answer, I wrote:

> The Governments' argument and the authorities they cite establish the sanctity of the governmental deliberative process. The privilege is designed to foster communication and contemplation. But, as with the attorney-client privilege, it is important to distinguish between a fact and the communication or contemplation of a fact. Just as the client may not be compelled to answer the question "What did you say or write to your attorney?," so also a government official cannot be compelled to answer the question "What did you say in that meeting and what did you write in your diary?" But, just as the client may not refuse to disclose a relevant fact within his knowledge merely because he stated the fact in a meeting with his lawyer, so also a government official may not refuse to disclose a relevant fact within his knowledge merely because he stated or recorded the fact in some deliberative context. Deliberative processes, not facts within the independent knowledge of the deliberator, are protected by the privilege. The privilege protects disclosure of communications, not disclosure of the underlying facts.

> Subject to constraints which are independent of the deliberative privilege and which are not at issue here, the opinions of a witness can be discoverable facts. Subject to these constraints, a witness may be asked his present opinion, or his opinion at a given time. This is so even if he or she might have expressed the opinion in a meeting or written it in a notebook. The deliberative privilege only permits a witness to refuse to say whether the opinion was expressed at a meeting or written in a notebook.

> So, for example, by invoking the deliberative privilege, George Bush can refuse to say whether or not he opposed the arms for hostages swap at a given White House meeting, and he can refuse to say what he wrote on the subject in his diary, and he can refuse to produce the minutes of the meeting or the diary; but he may not avoid giving his opinion of the swap—his opinion today, and his opinion at a given time in the past.[8]

This discovery dispute, which was a small storm on the horizon on January 28, soon became a tornado in the back yard. In a letter to me on February 8, the State characterized the issue at stake as "by far the most important question on deliberative privilege to arise since Judge Curtin's ruling a year ago" and "one which will reappear repeatedly during depositions and at trial both in Phase I and Phase II."[9] And, in that same letter, the State predicted that the issue would "arise again during the deposition of former Commissioner Robert Whalen."[10] Not surprisingly, the State's

3. January 28 Ruling at pages 1–12.

4. At the oral argument on January 27, the State referred to the privilege it was invoking as the "deliberative privilege." Later, it became clear that it was useful to refer to the privilege at issue as the "mental processes" privilege.

5. January 28 Ruling at pages 12–14.

6. January 19 Axelrod Deposition at Pages 349–351. Reproduced as Appendix Item # 1.

7. January 28 Ruling at pages 12–13.

8. *Id.* at pages 13–14.

9. Letter of Eugene Martin–Leff to Professor John Sexton dated February 8, 1988.

10. *Id.*

prediction proved correct. On nearly four dozen occasions during Doctor Whalen's deposition, the State's attorneys directed him not to answer a question on the ground that the material sought was protected by the mental processes privilege.[11] At the request of the parties, therefore, I received briefs and held two days of oral argument.

The essence of the State's argument is that a State official's opinions on policy matters are protected on two independent bases. If communicated to others engaged in governmental deliberations, they are protected by the intra-governmental deliberative privilege; but even if communicated to no one, they are protected by the mental processes privilege. Moreover, in the State's view, the mental processes privilege protects uncommunicated opinions whether they are current or past opinions (whether they have been framed after a decision or contemporaneous to it), because in the State's view the revelation of present opinions tends to reveal opinions held at the time of the decision.

The State's argument, valid or not, relies on a privilege which is analytically distinct from the deliberative privilege protecting intra-governmental *communications*. Therefore, the State correctly argues that nothing in my January 28 Ruling, which addressed only the scope of the deliberative privilege, precludes it from advancing the mental processes privilege as justification for directing its witnesses not to answer the questions at issue here. For this reason, in today's Ruling I address the meaning and scope of the mental processes privilege.

It is beyond cavil that, in litigation like this, it is important to define the parameters of privileges carefully. Moreover, the

questions involving *this* privilege tend to arise during depositions involving many lawyers and important State officials—in other words, questions involving this privilege tend to arise when time spent arguing about the privilege is especially costly. Therefore, I have proceeded on the assumption that extra time spent now defining the meaning and scope of the mental processes privilege may save substantial time and cost at later stages.

I have examined carefully not only the cases cited by the parties but also the cases cited in those cases, the cases cited in the treatises and journals, and other cases I have found myself. In this Ruling, I will be as precise as possible in defining abstractly the scope of the mental processes privilege as I see it, and I will present my discussion of the cases in a way that, in the event of appeal, will save the court the trouble of retracing every step that I have taken. I also will outline procedures which will allow discovery to proceed expeditiously in those instances where the State or others invoke the mental processes privilege.

I. *The Background Issue: The Deliberative Privilege*

The Federal Rules of Civil Procedure embody a commitment to openness and broad disclosure. The presumption is that any material calculated to lead to admissible evidence is discoverable. Thus, though Rule 26(b)(1) limits discovery to matters "not privileged," it is well established that testimonial privileges are to be construed as narrowly as possible,[12] and that the party invoking a privilege bears the burden of demonstrating its applicability.[13]

---

**11.** These instances are recorded in Appendix Items # 2 through # 40. Some of the Appendix Items record instructions not to answer several questions.

**12.** 8 J. Wigmore, Wigmore on Evidence, secs. 2191–2192 (McNaughton rev. ed. 1961). This general principle has been applied as well to privileges designed to foster efficiency in government work and to enhance the governmental decision-making process. *See, e.g., Murphy v. Tennessee Valley Authority*, 571 F.Supp.

502 (D.D.C.1983); *Nationwide Mutual Insurance Co. v. Friedman*, 451 F.Supp. 736 (D.Md.1978).

**13.** *See, e.g., In re Horowitz*, 482 F.2d 72, 82 (2d Cir.), *cert. denied*, 414 U.S. 867 [94 S.Ct. 64, 38 L.Ed.2d 86] (1973); *Burke v. New York City Police Department*, 115 F.R.D. 220, 231 n. 8 (S.D.N.Y.1987); *Apex Oil Company v. DiMauro*, 110 F.R.D. 490, 493–94 n. 3 (S.D.N.Y.1985); *Gulf Oil Corporation v. Schlesinger*, 465 F.Supp. 913, 916 (E.D.Penn.1979).

The deliberative privilege is a subcategory of the governmental privilege.[14] It "protects from disclosure those agency documents which reflect 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' "[15] In so doing, its purpose is to create an atmosphere in which governmental officials can hold frank and open discussions in reaching decisions without fearing public disclosure of the decisionmaking process. As the Supreme Court explained in *National Labor Relations Board v. Sears, Roebuck & Company:*

> Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions. The quality of a particular agency

decision will clearly be affected by the communications received by the decisionmaker on the subject of the decision prior to the time the decision is made.[16]

The rationale for the deliberative privilege also dictates its limits. It applies only to communications that are part of a decisionmaking process. Thus, it does not apply to the "opinions" or "conclusions" of those not part of that process.[17] It does not apply to underlying factual documents that are relied on in the decisionmaking process, or to statements that summarize facts.[18] Furthermore, the privilege does not apply to documents that describe an agency's policy after it has been adopted, or to pre-decisional documents that are incorporated into the agency's final decision.[19]

14. *Zinker v. Doty*, 637 F.Supp. 138, 140 (D.Conn. 1986); *Mobil Oil Corporation v. Department of Energy*, 102 F.R.D. 1, 4–5 (N.D.N.Y.1983).

15. *Zinker v. Doty*, 637 F.Supp. 138, 140 (D.Conn. 1986); *Mobil Oil Corporation v. Department of Energy*, 102 F.R.D. 1, 5 (N.D.N.Y.1983) (citations omitted).

16. 421 U.S. 132, 151 [95 S.Ct. 1504, 1516–17, 44 L.Ed.2d 29] (1975) (citations and footnotes omitted). *See, also, Soucie v. David*, 448 F.2d 1067, 1080–81 (D.C.Cir.1971) (Wilkey, J., concurring) ("Historically ... the privilege ... arises from the common sense common law principle that all public business can not be transacted completely in the open, that public officials are entitled to the private advice of their subordinates and to confer among themselves freely and frankly, without fear of disclosure, otherwise the advice received and the exchange of views may not be as frank and honest as the public good requires"); *Ackerley v. Ley*, 420 F.2d 1336, 1341 (D.C.Cir.1969) (The deliberative privilege seeks to encourage a "free and uninhibited exchange and communication of opinions, ideas and points of view—a process as essential to the functioning of a big government as it is to any organized human effort"). *Smith v. FTC*, 403 F.Supp. 1000, 1015 (D.Del.1973) [1975] ("The purpose behind the executive privilege against disclosure of intra-agency advisory communications is the encouragement of frank discussions within the government as regards formulation of policy. This is because 'human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances to the detriment of the decision-making process."); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 325 (D.D.C.1968), *aff'd mem. sub nom. Carl Zeiss, Jena v. Clark*, 384 F.2d 979 (D.C.Cir.), *cert. denied*, 389 U.S. 952 [88 S.Ct.

334, 19 L.Ed.2d 361] (1967) ("It is evident that the Department to function adequately must depend heavily upon candid exchange of ideas ...").

17. *Machin v. Zuckert*, 316 F.2d 336, 340 (D.C. Cir.), *cert. denied*, 375 U.S. 896, [84 S.Ct. 172, 11 L.Ed.2d 124] (1963) (The "opinions" and "conclusions" of Air Force mechanics who investigated possible defects in propeller mechanism after a crash are *not* protected by the deliberative privilege because "[t]heir investigations and reports would not be inhibited by knowledge that their conclusions might be made available for use in future litigations ...").

18. *EPA v. Mink*, 410 U.S. 73, 87–88 [93 S.Ct. 827, 836, 35 L.Ed.2d 119] (1971); *Bristol–Myers Co. v. FTC*, 424 F.2d 935, 939 (D.C.Cir.), *cert. denied*, 400 U.S. 824 [91 S.Ct. 46, 27 L.Ed.2d 52] (1970) ("Purely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only those internal working papers in which opinions are expressed and policies formulated and recommended."). *See In re Franklin National Bank Securities Litigation*, 478 F.Supp. 577, 581–582 (E.D.N.Y.1979). *Id.* at 584 ("Most of the statements that the government characterizes as expressions of opinion could, as well, be characterized as 'shorthand' statements of fact.")

19. *See National Labor Relations Board v. Sears, Roebuck & Company*, 421 U.S. 132, 151–52 [95 S.Ct. 1504, 1516–17, 44 L.Ed.2d 29] (1975) ("[I]t is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such

Chief Judge Curtin has provided the definitive exposition of the deliberative privilege as it operates in this case.[20]

Generally speaking, the deliberative privilege applies to all material reflecting the actual pre-decisional, mental, or deliberative process—inter- and intra-governmental evaluations, expressions of opinion, and recommendations on policy and decision-making matters. However, it does not apply to post-decisional, or so-called "working law communications," *i.e.*, explanations or interpretations of an existing government decision. The deliberative privilege also does not apply to 1) purely factual material or data which may be severed from a given deliberative memorandum or report, or 2) material which evaluates the implementation of a given government decision.[21]

Chief Judge Curtin also made clear that the deliberative privilege is not an absolute privilege—and that even material concededly within its scope sometimes must be disclosed.[22] Whether particular material within its scope must be disclosed is determined by a balancing test which turns upon the nature of the allegedly protected material and the context of the specific litigation.

In this case, he ruled, most material falling within the scope of the deliberative privilege should *not* be disclosed.[23] He noted one important exception, however. OCC has the right to obtain any material which, though falling within the scope of the privilege, explicitly evidences the State's concern for the possible political ramifications of the Love Canal situation (or other factors unrelated to the health and safety of those living or working near Love Canal) and which suggests various actions in light of these political ramifications (or other factors unrelated to the health and safety of those living or working near Love Canal).[24]

## II. *The Mental Processes Privilege*

The privilege now invoked by the State protects the "thoughts," the "cerebrations," or the "mental processes" of an official even if he or she *never communicates* them to anyone. Such a privilege offers protection different from the deliberative privilege—which, as I have noted, is designed to protect the full and frank *exchange* of ideas.[25] Analytically, the deliberative privilege (for which communication is a *sine qua non*) is quite distinct

communications, as long as prior communications and the ingredients of the decisionmaking process are not disclosed. Accordingly, the lower courts have uniformly drawn a distinction between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not."); *Taxation With Representation v. IRS*, 646 F.2d 666, 678 (D.C.Cir.1981); *Coastal States Gas Corporation v. Department of Energy*, 617 F.2d 854, 863 (D.C.Cir.1980).

20. Supplemental Order # 8 (February 18, 1987).

21. *Id.* at 4–5.

22. *Id.* at 5.

23. *Id.* at 7–8.

24. *Id.* at 8.

25. Thus, for example, in *National Labor Relations Board v. Sears, Roebuck & Company*, 421 U.S. 132 [95 S.Ct. 1504, 44 L.Ed.2d 29] (1975), the Supreme Court spoke of "the *communications* received by the decisionmaker." *Id.* at 151 [95 S.Ct. at 1516–1517] (emphasis added). The Court also said:

The precise contours of the privilege in the context of this case are less clear, but may be gleaned from expressions of legislative purpose and the prior case law. The cases uniformly rest the privilege on the policy of protecting the "decision making processes of government agencies," and focus on documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions are formulated." The point, plainly made in the Senate Report, is that the "frank discussion of legal or policy matters" in writing might be inhibited if the discussion were made public; and that the "decisions" and "policies formulated" would be the poorer as a result.

*Id.* at 150 [95 S.Ct. at 1516].

In the cases cited in Note 16, the respective courts spoke of an "exchange of views" (*Soucie*), a "free and uninhibited exchange and communication of opinions" (*Ackerley*), "frank discussions" (*Smith*), and a "candid exchange of ideas" (*Carl Zeiss*). See the complete quotations in Note 16, *supra*. And, in his Order defining the scope of the deliberative privilege, Chief Judge Curtin spoke of "evaluations, expressions of opinions and recommendations on policy." Supplemental Order # 8 at pages 4–5.

from the mental processes privilege (for which communication is totally irrelevant). Thus, the Larkin treatise on privileges which the State cites in its brief distinguishes between "the privilege protecting certain interagency and intraagency communications" and "the *relatively new* privilege that protects mental processes of government officials."[26]

The Larkin treatise also provides the most complete description of the "relatively new" privilege the State now claims:

> The mental processes privilege protects certain testimony of a governmental official who acts in a judicial, quasi-judicial, or administrative decision-making capacity and has arrived at decisions within the scope of his or her power. The protection covers testimony as to the mental processes by which the official arrived at such decisions, the manner and extent of his/her study of the subject, and his/her consultations with subordinates. Thus, included within and protected by the privilege is testimony concerning the mental activities of the official, the methods by which a decision was reached, the matters considered, the contributing influences, and the role played in the decision by the work or expressions of others. Similarly, a resume of the process of sifting and analyzing the evidence, if used by the official and therefore a part of the internal decisional process, is protected. The justification for this protection is the fear that to permit examination of such matters would be destructive of executive responsibility and the decisional process. Just as a judge may not be subjected to such scrutiny, so the integrity of the administrative decisional process must be equally respected.[27]

---

**26.** M. Larkin, Federal Testimonial Privilege (1987), at 5–2. *See also, id.* at 5–15 and 5–16 n. 37 (ascribing to the deliberative privilege protection of *"records and information* that would disclose the mental processes of an agency engaged in making a decision or formulating a policy" and protection of the *"products* of group thinking within the agency," while ascribing to the mental processes privilege protection of "direct testimony as to the mental processes of a decision maker").

This distinction was emphasized by the court in *Pierson v. United States,* 428 F.Supp. 384 (D.Del.1977). *Pierson* was a tax refund suit. The taxpayer sought the documents and materials considered by the Commissioner in deciding to apply retroactively the revocation of a letter ruling. The government resisted discovery, citing the *Morgan* "mental processes" privilege. The court ruled that the privilege was inapplicable to documents:

> The defendant has raised the mental process privilege as an objection to discovery of memoranda involved in making the Section 7805(b) determination, including those relied upon by the Commissioner. This claim, however, confuses the mental process privilege with the broader executive privilege. The former privilege was established to prevent inquiry into the mental process by which an administrator arrived at a decision. [The cases giving rise to the mental process privilege] concerned the propriety of requiring decision makers to give testimony either in court or by deposition to explain their actions and thus to be subject to oral direct and cross-examination. [T]he plaintiff has not sought to depose the Commissioner or other responsible officials. What he seeks by his motion are documents and other material. The mental process privilege asserted here simply is not applicable to the plaintiff's present motion.

*Id.* at 392 (citations omitted).

Nevertheless, the court went on:

> The defendant has asserted several other privileges to prevent disclosure of documents sought by the plaintiff, most frequently executive privilege. Defendant argues that this privilege, while not constitutionally based, derives from important policies long recognized and respected by courts. Foremost among the reasons for its recognition is the promotion of frank and open discussion within the agency in its formulation of policy. [T]he scope of the privilege was defined to include: "intragovernmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."

*Id.* at 392–93 (citations omitted).

**27.** *Id.* at 5–88 to 5–89 (citations omitted). The citation of cases in the Larkin Treatise is, in my view, unreliable—at least in the section on the mental processes privilege. I have read all of the cases cited in the Treatise. Many of the cases it cites to trace the development of a distinct mental processes privilege (covering thought processes) in contrast with the deliberative privilege (covering the communication of one's thought as part of a decisional process) are pure deliberative privilege cases with no distinct mental processes component. *See, e.g., Sprague Electric Company v. United States,* 462 F.Supp. 966 (Cust.Ct.1978). Even more serious is the fact that some of the cited cases do not

There is language in some cases to support the existence of the mental processes privilege described by Professor Larkin. The question is whether, as the State contends, that privilege properly applies in the circumstances of this case—and, if so, to what extent. The answer to that question is not easy to find. The case law is confusing—and confused. There undeniably is some dicta apparently recognizing a mental processes privilege in situations close to the one at hand. But such dicta often support the existence of a privilege by ref-

erence to premises developed in situations fundamentally different from the one at hand without examining whether, given the change of context, the premises remain intact. For this reason, I will examine the argument for a mental processes privilege in a series of steps.

## A) *MORGAN and Its Direct Progeny*

The State correctly asserts that the roots of the mental processes privilege can be traced to the Supreme Court's decision in *United States v. Morgan.*[28] At various

describe *either* privilege. *See, e.g., Norris & Hirshberg v. Securities and Exchange Commission,* 163 F.2d 689 (D.C.Cir.1947). This latter group simply is miscited. I should note that the State has not cited the cases used by Larkin; the flaws belong to the Larkin Treatise alone. The existence of these flaws seriously undermines the authority of the Larkin treatise, however, and necessitates an independent discussion of the cases.

28. 313 U.S. 409 [61 S.Ct. 999, 85 L.Ed.2d 1429] (1941). At oral argument, the State also raised two earlier Supreme Court decisions. In one, *Chicago, Burlington and Quincy Railway Co. v. Babcock,* 204 U.S. 585 [27 S.Ct. 326, 51 L.Ed. 636] (1907), several railroad corporations attacked assessments made by Nebraska's assessing board on due process grounds. At trial, members of the assessing board (including the Governor of Nebraska) were called as witnesses and cross-examined about their mental processes in reaching the valuations. The Court held that the railroads had not proven fraud or duress. More to our point, it also held that, in a collateral proceeding attacking the judgment of an assessing board, it is improper to cross-examine board members in an attempt to exhibit confusion in their minds over how the result was reached. In the words of Justice Holmes, writing for the Court:

All the often repeated reasons for the rule as to jurymen apply with redoubled force to the attempt, by exhibiting on cross-examination the confusion of the members' minds, to attack *in another proceeding* the judgment of a lay tribunal, which is intended, so far as may be, to be final, notwithstanding mistakes of fact or law.

*Id.* at 593 [27 S.Ct. at 327] (emphasis added). As the underscored phrase in the quoted passage makes clear, *Babcock* is principally about the propriety of *collateral attack* on an administrative finding based upon the compelled testimony of the administrative decisionmakers. As Justice Holmes put the Court's holding:

Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, [the Board] is the ultimate guardian of certain rights. The

State has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. *Somewhere there must be an end.* We are of opinion that whatever grounds for uneasiness may be perceived nothing has been proved so clearly and palpably as it should be proved ... in order to warrant these appeals to the extraordinary jurisdiction of the Circuit Court.

*Id.* at 598 [27 S.Ct. at 329] (emphasis added).

Or, as Justice Holmes put it immediately after the passage proscribing cross-examination of board members in the circumstances present in *Babcock:*

Again, this Board necessarily kept and evidently was expected by the statutes to keep a record. This was the best evidence, at least, of its decisions and acts. If the roads had wished an express ruling by the Board upon the deductions which they demanded, they could have asked for it and could have asked to have the action of the Board or its refusal to act noted in the record. It would be time enough to offer other evidence, when such a request had been made and refused.

*Id.* at 593–594 [27 S.Ct. at 327]. In other words, *Babcock* speaks more to the devices for review of administrative decisions than to the propriety *vel non* of a "mental processes" privilege.

The second pre-*Morgan* Supreme Court decision raised by the State at oral argument was *DeCambra v. Rogers,* 189 U.S. 119 [23 S.Ct. 519, 47 L.Ed. 734] (1903), an action for ejectment brought by Rogers in California Superior Court against DeCambra. DeCambra defended by claiming equitable title to the land in question, and Rogers demurred to this cross-complaint. This demurrer was sustained, and, after a trial, judgment was entered for Rogers. The California Supreme Court affirmed, and, upon writ of error, a unanimous United States Supreme Court also affirmed.

As Justice Brewer put it: "The only question presented [in the *DeCambra* case] arises on the demurrer to the cross complaint." *Id.* at 120 [23 S.Ct. at 520]. In that pleading, DeCambra averred among other things that the Land Department and the Secretary of the Interior had denied his application for a patent to the land

and awarded the patent to Rogers even though "the Secretary had not read or heard read the evidence in the [application proceeding] and simply signed his name to a report prepared by one of the clerks in the department." *Id.* at 121 [23 S.Ct. at 530].

After noting that the cross-complaint did not describe the question of law decided in the application proceeding, did not disclose the grounds of the decision, and did not provide the testimony proffered, the Court concluded that "[f]or all that appears, the officers may have found the facts to be just the contrary to the averments in the cross complaint." *Id.* As the Court put it: "[N]othing is shown except an ordinary contest between two applicants for preemption, in which land officers upon testimony decided in favor of one and against another." *Id.* at 122 [23 S.Ct. at 530–531]. Thus, the Court affirmed, saying "it is well settled that the decision of the Land Department upon questions of fact is conclusive on the courts." *Id.*

It is difficult to read *DeCambra* as a privilege case. True, in *dicta*, Justice Brewer volunteered: "It is hardly necessary to say that when a decision has been made by the Secretary of the Interior, courts will not entertain an inquiry as to the extent of his investigation and knowledge of the points decided, or as to the methods by which he reached his determination." *Id.* But, in context, this *dictum* speaks only to whether it is appropriate in administrative proceedings for the official ultimately responsible to rely upon hearing examiners and staff assistants. The *dictum* clearly does not speak to the existence or non-existence of a privilege, let alone to the broad privilege asserted here by the State.

There is a third pre-*Morgan* case which the State has not raised, but which frequently is cited by courts discussing the mental processes privilege. It is *Fayerweather v. Ritch*, 195 U.S. 276 [25 S.Ct. 58, 49 L.Ed. 193] (1904).

*Fayerweather* is a *res judicata* case involving the preclusive effect in a collateral action (Action # 2) of a judgment of a New York court on the validity of a will (Action # 1). Action # 1 was tried by the court without a jury. No special findings of fact were made, but a judgment was entered. And, the judgment in Action # 1 was affirmed on appeal.

In Action # 2, the plaintiff argued that Action # 1 had not determined the validity of certain releases. The *Fayerweather* Court (which had before it Action # 2) summarized the state of the case as follows:

We have thus the case of a hearing in the trial court upon issues which required a determination of the validity of these releases as a condition of a judgment adverse to these plaintiffs; a judgment against them; an affirmance of the judgment by the general term of the Supreme Court, with an opinion declaring that there was in the record no evidence justifying the claim that these releases were fraudulently obtained and void; and a further

affirmance by the Court of Appeals, accompanied by an opinion declaring that upon the state of the record it was to be presumed that the validity of the releases had been affirmatively found, and also that there was sufficient evidence to sustain such a finding, followed by a refusal to send the question of the validity of the releases back to the trial court for consideration. Notwithstanding all this, apparent upon the face of the record, the plaintiffs insist that the validity of the releases was never determined by any of the state courts, and that the final judgment of affirmance by the Court of Appeals was based upon the presumption of a determination which was never in fact made.

*Id.* at 305 [25 S.Ct. at 67]. The plaintiffs pressed their argument in part by citing testimony of the trial judge, given in Action # 2 some six years after his decision in Action # 1, to the effect that he did not consider the effect of the releases.

The *Fayerweather* Court ruled that, while in some cases on a plea of *res judicata* evidence beyond the record of the initial action is admissible to show what questions were tried and determined in the former case, it is not proper to introduce the testimony of the trial judge as to the matters then considered and passed upon by him. In this regard, the *Fayerweather* Court uttered a passage frequently cited in support of the mental processes privilege:

[T]he testimony of the trial judge, given six years after the case has been disposed of, in respect to matters he considered and passed upon, was obviously incompetent. True, the reasoning of the court for the rule [prohibiting testimony by jurors] is not wholly applicable, for as the case was tried before a single judge there were not two or more minds coming by different processes to the same result. Nevertheless no testimony should be received except of open and tangible facts—matters which are susceptible of evidence on both sides. A judgment is a solemn record. Parties have a right to rely on it. It should not lightly be disturbed, and ought never to be overthrown or limited by the oral testimony of a judge or juror of what he had in mind at the time of the decision.

*Id.* at 306–07 [25 S.Ct. at 67–68].

Seen in context, this passage from *Fayerweather* does not address the existence or non-existence of a mental processes privilege. The Supreme Court was not focusing on the privilege issue; and, indeed, there is nothing to indicate that any claim of privilege was made in the case.

---

29. *Morgan I,* 298 U.S. 468 [56 S.Ct. 906, 80 L.Ed. 1288] (1936); *Morgan II,* 304 U.S. 1 [58 S.Ct. 773, 82 L.Ed. 1129] (1938); *Morgan III,* 307 U.S. 183 [59 S.Ct. 795, 83 L.Ed. 1211] (1939); *Morgan IV,* 313 U.S. 409 [61 S.Ct. 999, 85 L.Ed. 1429] (1941).

*IV,* however, which generates the mental processes privilege.[30]

The controversy in the *Morgan* quartet was triggered when a group of market agencies challenged rate orders issued by the Secretary of Agriculture. *Morgan IV* is the final act of the drama. Over the Government's objection, the trial court had permitted the Secretary to be deposed and, at trial, to be examined at length about the process by which he made his decision, including the way in which he studied the record and consulted with his subordinates. The Supreme Court reversed, holding that the Secretary should not have been questioned because his deliberations, at least in the controversy before the *Morgan* Court, were functionally those of a judge. As Justice Frankfurter put it for the Court:

> Much was made of [the Secretary's] disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary "has a quality resembling that of a judicial proceeding." *Morgan v. United States,* 298 U.S. 468, 480, [56 S.Ct. 906, 911, 80 L.Ed. 1288] (1936). Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that "it was not the function of the court

to probe the mental processes of the Secretary." *Morgan v. United States,* 304 U.S. 1, 18, [58 S.Ct. 773, 776, 82 L.Ed. 1129] (1938). Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected. It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, [the administrative process and the courts] are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other. *United States v. Morgan,* 307 U.S. 183, 191, [59 S.Ct. 795, 799–800, 83 L.Ed. 1211] (1939).[31]

What emerges from the *Morgan* quartet viewed through the lens of *Morgan IV* is the important principle that the administrators legally responsible for making administrative law must make it themselves, and that their method of doing so is in some respect beyond judicial scrutiny. Thus, courts have relied on the *Morgan* cases in upholding the use of hearing examiners to develop evidence and form preliminary decisions,[32] in approving the reliance on staff assistants for recommendations and draft opinions,[33] and in authorizing a variety of other procedures designed to apprise administrative decisionmakers of critical issues and evidence.[34] Concomitantly, courts have refused to issue subpoenas for the

---

**30.** The State also cites language from *Morgan II,* 304 U.S. 1, 18 [58 S.Ct. 773, 776, 82 L.Ed. 1129] (1938) ("it was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions"). State's Brief at 3. Though the State characterizes the quoted language as the Court's "ruling," it clearly is *dicta*—indeed, *dicta* completely unrelated to the Court's holding that the order of the Secretary of Agriculture was *invalid* because the "full hearing" required by the governing statute had not been provided. It should be noted, however, that in *Morgan IV* the Supreme Court itself referred to the quoted language as though it were holding and not *dicta. United States v. Morgan,* 313 U.S. 409, 422 [61 S.Ct. 999, 1004–05, 85 L.Ed. 1429] (1941).

**31.** *Id.* at 422 [61 S.Ct. at 1004–05] (some citations omitted).

**32.** *See, e.g., Edison Co. v. Labor Board,* 305 U.S. 197, 228 [59 S.Ct. 206, 216, 83 L.Ed. 126] (1938);

*Labor Board v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 350–51 [58 S.Ct. 904, 912–13, 82 L.Ed. 1381] (1938); *Utica Mutual Insurance Co. v. Vincent,* 375 F.2d 129, 131–32 (2d Cir.), *cert. denied,* 389 U.S. 839 [88 S.Ct. 63, 19 L.Ed.2d 102] (1967); *Braniff Airways, Inc. v. CAB,* 379 F.2d 453, 461 (D.C.Cir.1967); *NLRB v. Stocker Mfg. Co.,* 185 F.2d 451, 452–54 (3rd Cir.1950); *Norris & Hirshberg v. SEC,* 163 F.2d 689, 693 (D.C.Cir.1947), *cert. denied,* 333 U.S. 867 [68 S.Ct. 788, 92 L.Ed. 1145] (1948).

**33.** *National Nutritional Foods Association v. FDA,* 491 F.2d 1141, 1146 (2d Cir.1974); *Braniff Airways, Inc. v. CAB,* 379 F.2d 453, 461 (D.C.Cir. 1967).

**34.** *See, e.g., Utica Mutual Insurance Co. v. Vincent,* 375 F.2d 129, 131–34 (2d Cir.), *cert. denied,* 389 U.S. 839 [88 S.Ct. 63, 19 L.Ed. 102] (1967); *Braniff Airways, Inc. v. CAB,* 379 F.2d 453, 461 (D.C.Cir.1967).

staff memos, expert reports, and preliminary drafts produced for these purposes; and they have refused to order the oral testimony of the decisionmaker regarding the basis of his or her decision.[35]

Even in its pure form, the mental processes privilege generated by *Morgan* is not absolute. There is the hornbook rule that, where a party makes a *prima facie* showing that a decision of an agency or of a judicial officer is tainted by impropriety, the decisionmaking process may be an appropriate subject of inquiry.[36] And, more to the point, the Supreme Court has indi-

**35.** See, e.g., *Bank of Commerce of Laredo v. City National Bank of Laredo,* 484 F.2d 284, 287 (5th Cir.1973), *cert. denied,* 419 U.S. 905 [94 S.Ct. 1609, 40 L.Ed.2d 109] (1974) (given an adequate administrative record, and in the absence of a prima facie showing of sham and subterfuge, a party seeking review of a ruling made by the Comptroller of the Currency may not depose the Comptroller about his decision); *Davis v. Braswell Motor Freight Lines, Inc.,* 363 F.2d 600, 604 (5th Cir.1966); *Air Line Pilots Association, International v. Quesada,* 286 F.2d 319, 320 (2d Cir. 1961); *North American Airlines v. CAB,* 240 F.2d 867, 874 (D.C.Cir.1956), *cert. denied,* 353 U.S. 941 [77 S.Ct. 815, 1 L.Ed. 760] (1957).

Thus, in *National Nutritional Foods Association v. Food and Drug Administration,* 491 F.2d 1141 (2d Cir.1974) (Friendly, J.), the Association sought review of two FDA orders which were produced after notice and comment proceedings. In so doing, it also sought to depose the FDA Commissioner. Its argument was that he had been in office for too short a time (13 days) to have given consideration to the rules they were challenging (and to several other sets of rules he had issued during the same 13-day period). Invoking *Morgan,* Judge Friendly refused to allow inquiry into the mental processes of the Secretary in the context of judicial review of agency action.

In *First Federal Savings & Loan Association of Thief River Falls v. Federal Home Loan Bank Board,* 496 F.Supp. 227 (D.Minn.1980), an action challenging a resolution of the Federal Home Loan Bank Board permitting a savings and loan association to open a branch, the court held that the mental processes privilege precluded discovery concerning the extent to which a Board member read the record prior to voting, the portions of the record that he had read, and the nature of other data he consulted.

And, in *Continental Distilling Corp. v. Humphrey,* 17 F.R.D. 237 (D.D.C.1955), an action challenging a ruling (promulgated after a public hearing) by the Alcohol and Tobacco Tax Division of the Internal Revenue Service, Consolidated Distilling sought to depose the Director of the Alcohol and Tax Division. The agency resisted the subpoena, invoking the mental processes privilege. The court permitted the deposition to go forward, saying that Continental Distilling was "entitled to discover, prior to trial, the facts which [the Government] defendants propose to put in evidence in their defense." *Id.* at 241. However, it barred discovery of "the mental operations by which [the Government] defendants arrived at their opinions or made their judgments." *Id.*

**36.** See, e.g., *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 [91 S.Ct. 814, 825–26, 28 L.Ed.2d 136] (1971); *Shaughnessy v. United States ex rel. Accardi,* 349 U.S. 280, 281–284 [75 S.Ct. 746, 746–48, 99 L.Ed. 1074] (1955); *KFC National Management Corporation v. NLRB,* 497 F.2d 298, 305 (2d Cir.1974), *cert. denied,* 423 U.S. 1087 [96 S.Ct. 879, 47 L.Ed.2d 98] (1976); *Feller v. Board of Education,* 583 F.Supp. 1526, 1528 (D.Conn.1984).

Thus, in *Union Savings Bank of Patchoque, New York v. Saxon,* 209 F.Supp. 319 (D.D.C. 1962), the court allowed the deposition of the Comptroller of the Currency where the complaint alleged that he had issued a branch certificate to a rival bank based upon a "personal relationship" with the president of the rival bank. In the court's words:

Certainly, this Court does not encourage the procedure of taking the oral deposition of the head of an agency of the United States Government, and under normal circumstances would not allow such procedure. The Court recognizes that such an official's time and the exigencies of his everyday business would be severely impeded if every plaintiff filing a complaint against an agency head, in his official capacity, were allowed to take his oral deposition. Such procedure would be contrary to the public interest, plus the fact that ordinarily the head of an agency has little or no knowledge of the facts in the case. In the instant case, however, Plaintiffs allege actions personal to the Defendant and in violation of the United States Code.

*Id.* at 319–20.

To trigger the "impropriety" exception to the mental processes privilege, however, the party seeking discovery must make a *prima facie* showing that impropriety exists. Thus, in *Warren Bank v. Saxon,* 263 F.Supp. 34 (E.D.Mich. 1966), *aff'd sub nom. Warren Bank v. Camp,* 396 F.2d 52, 56 (6th Cir.1968), the district court wrote:

What the plaintiff is actually arguing, with respect to deposing the Comptroller, is that if a plaintiff merely alleges the Comptroller to be arbitrary, he can thereupon question him to see whether or not he really is arbitrary, despite a showing in the administrative file of the exercise of a careful and conscientious discretion. There is no precedent for such a course of action, it is not warranted in the statutes, and it would be utterly destructive of the manifested Congressional intent to vest a broad discretion to the expertise of an admin-

cated that decisionmakers may be examined about their deliberations when such examination is necessary for effective judicial review. Thus, in *Citizens to Preserve Overton Park v. Volpe*,[37] the Court held that the Transportation Secretary could be compelled to explain an administrative decision in the absence of administrative findings that would disclose the manner in which he construed the evidence before him to reach the decision. As the Court put it:

> [S]ince the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard.

The court may require the administrative officials who participated in the decision to give testimony explaining their action. Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided. *United States v. Morgan*, 313 U.S. 409, 422, [61 S.Ct. 999, 1004–05, 85 L.Ed. 1429] (1941). And where there are administrative findings that were made at the same time as the decision, as was the case in *Morgan*, there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves.[38]

---

istrative official in this sensitive and complex area of banking. Plaintiff has the cart before the horse. Plaintiff wants to depose the Comptroller to expose wrongdoing. The law is the other way around. If Plaintiff can show wrongdoing (not in the sense of proving it, but merely showing circumstances that to a reasonable view would indicate sham, subterfuge or similar wrong) he may then depose the Comptroller as required.
263 F.Supp. at 39.

37. 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971).

38. *Id.* at 420 [91 S.Ct. at 825–26]. In its brief and at oral argument, the State cited the language in *Overton Park* to the effect that "inquiry into the mental processes of administrative decision-makers is usually to be avoided," which language is in the first paragraph of the *Overton Park* passage quoted in text. State's Brief at page 4; Transcript of the February 11 Oral Argument at pages 22–23. At oral argument, it also cited the language to the effect that "where there are administrative findings that were made at the same time as the decision ... there must be a strong showing of bad faith or improper behavior before [inquiry into the mental processes of the decisionmaker] may be made," which language is in the second paragraph quoted in text. Transcript of the February 22 Oral Argument at page 11. Neither passage captures the true meaning of *Overton Park* (or of the full passage quoted in text); and neither passage captures the Administrative Law context in which *Overton Park* stands.

*See also Public Power Council v. Johnson*, 674 F.2d 791, 793–94 (9th Cir.1982) ("When there is such a failure to explain administrative action as to frustrate effective judicial review, the court may obtain from the agency, either

through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary."); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C.Cir.1981) (a court may look beyond the record to discover rationales for agency decisions if such a look is required for complete judicial review); *S.D. Warren Company v. National Labor Relations Board*, 342 F.2d 814, 816–17 (1st Cir.1965) (in a case where some material exhibits had been misplaced, the court ordered Board members to testify whether, as they decided a case, they had the exhibits before them); *Texas Steel Co. v. Donovan*, 93 F.R.D. 619, 621 (N.D.Tex.1982) (even if a complete record is before the court, a plaintiff may conduct discovery beyond the record if such discovery is necessary to explain the reasoning of the agency's decision); *Petrolane Incorporated v. United States*, 79 F.R.D. 115, 119 (C.D.Cal.1978) ("Petrolane is entitled to discover any materials needed to complete the administrative record").

Thus, in *Gulf Oil Corporation v. Schlesinger*, 465 F.Supp. 713 [913] (E.D.Penn.1979), an action challenging a ruling of the Federal Energy Administration, Gulf Oil moved to compel deposition testimony by two former FEA officials. The Government resisted, invoking the mental processes privilege. Yet the court ordered the former officials to testify "to overcome [the] problem of the lack of a contemporaneous administrative explanation of a relevant agency action." *Id.* at 916. Following *Overton Park*, the court concluded "that the privilege traditionally given to agency decisionmakers was outweighed ... by the need for the information sought." *Id.*

And, in *A.O. Smith v. Federal Trade Commission*, 403 F.Supp. 1000 (D.Del.1975), several corporations sought pre-enforcement review of an annual reporting program announced by the

In short, the *Morgan* mental processes privilege in its pure form is not so much an evidentiary privilege as a doctrine defining the proper scope of judicial review. Seen in context, the *Morgan* privilege (or doctrine) is tied in important ways to the delegation of authority inherent in the creation of administrative agencies. Our courts supervise the utilization of this delegated authority by agencies, thereby ensuring that the agencies use their authority reasonably and within the parameters of the delegation. The *Morgan* quartet holds principally that the courts ordinarily can play their umpiral role without probing the private mental processes of the administrative decisionmaker, and holds concomitantly that the courts ordinarily can confine their review to whether the administrative decisionmaker followed proper rules and procedures and whether the administrative decision is reasonable in light of the record produced.

The rules generated by *Morgan* and its direct progeny must be understood in the special context that spawned them. So, when we say that the *Morgan* privilege (or doctrine) applies to "administrative decisions," we do not mean that it applies to every decision made by a government official; rather, we mean that it applies to the decisions made by government officials which, as a matter of Administrative Law, are subject to judicial review of one form or another. The *Morgan* quartet (and, in particular, *Morgan IV*) defines the scope of judicial review in that class of cases.

Viewed this way, the rationales of the pure *Morgan* privilege (or doctrine) become accessible. The *Morgan* Court itself emphasized that the administrative process and collateral courts are "collaborative instrumentalities of justice" [39] and that, in *Morgan* itself, the proceeding before the Secretary had "a quality resembling that of a judicial proceeding." [40] From these observations the Court concluded that, just as a reviewing court ordinarily does not probe the mental processes of a judge or a jury, so also a reviewing court usually should not probe the mental processes of an administrative decisionmaker. With the exception of a single allusion to the "integrity of the administrative process," [41] the *Morgan* Court did not say why this analogy has force. Of course, *Morgan IV* was decided at a time when formal labels often were dispositive. But, we must seek more explanation.

The pure *Morgan* privilege (or doctrine) cannot be based upon a belief that investigating the administrative decisionmaker's mental processes would lower the quality of the administrative decisions produced. Indeed, an argument could be made that,

---

Federal Trade Commission. The corporations noticed the depositions of four Commission officials who had been involved in developing the program, and the Commission requested a protective order barring certain questions at the depositions and barring discovery of certain documents. Because the administrative record was insufficient for judicial review, the Court ordered limited discovery to uncover the rationale behind the agency's decision.

In *Camp v. Pitts*, 411 U.S. 138 [93 S.Ct. 1241, 36 L.Ed.2d 106] (1973), the Supreme Court expanded the number of cases where supplementation of the administrative record is appropriate on review—adding those where either the "stated justification for informal action does not provide an adequate basis for judicial review," *id.* at 138 [93 S.Ct. at 1241], or "... there was such failure to explain administrative action as to frustrate effective judicial review...." *Id.* at 142–43 [93 S.Ct. at 1244]. However, the Court emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Id.* at 142 [93 S.Ct. at 1244].

The Supreme Court did not provide explicit guidelines in either *Overton Park* or *Camp* for District Courts to follow to obtain further "explanation" for allegedly arbitrary and capricious agency action. Instead, the Court chose to defer to the fact-finding expertise of the lower federal courts and placed the specific choice of means within the discretion of the reviewing court. *Compare Overton Park*, 401 U.S. at 420–21 [91 S.Ct. at 825–26], with *Camp v. Pitts*, 411 U.S. at 142–43 [93 S.Ct. at 1244].

39. *United States v. Morgan (Morgan IV)*, 313 U.S. 409, 422 [61 S.Ct. 999, 1004–05, 85 L.Ed. 1429] (1941).

40. *Morgan v. United States (Morgan I)*, 298 U.S. 468, 480 [56 S.Ct. 906, 911, 80 L.Ed. 1288] (1936).

41. *United States v. Morgan (Morgan IV)*, 313 U.S. 409, 422 [61 S.Ct. 999, 1004–05, 85 L.Ed. 1429] (1941).

as a matter of judicial review, courts might *better* police administrative decisionmakers (and, thereby, help generate *better* administrative decisions) by inquiring into the mental processes involved.

The pure *Morgan* privilege (or doctrine) can be justified on two grounds. First, in those cases where an administrative decisionmaker does act like a judge or jury (that is, where he or she acts, in a presumably neutral way, to decide a controversy or to promulgate a rule), it is not "in role" for that official to become a witness in the reviewing court.[42] To become a witness is to move from the model of the neutral decisionmaker. Second, and more important, it would be highly inefficient for reviewing courts to retrace the mental processes of administrative decisionmakers— so inefficient that it might undermine a purpose for which the agency was estab-

lished. In Administrative Law, agency decisions enjoy a presumption of regularity precisely because we do not want reviewing courts acting as *fora de novo*.[43] Conceivably, it was these two considerations which Justice Frankfurter had in mind when he asserted that the *Morgan* privilege (or doctrine) would preserve the "integrity of the administrative process."[44]

In its brief and at oral argument, OCC contended that the *Morgan* mental processes privilege is limited to cases where decisionmakers acting "in a quasi-judicial capacity" are "making decisions based on an administrative record."[45] As I have indicated, a more accurate statement is that the *Morgan* mental processes privilege, at least *in its pure form*, is an Administrative Law doctrine defining the scope of judicial review. This explains

---

**42.** Cf. *Hickman v. Taylor*, 329 U.S. 495, 517 [67 S.Ct. 385, 396, 91 L.Ed. 451] (1947) (Jackson, J., concurring) ("Every lawyer dislikes to take the stand and will do so only for grave reasons. This is partly because it is not his role; he is almost invariably a poor witness. But he steps out of professional character to do it. He regrets it; the profession discourages it.")

The Fifth Circuit, in *United States v. Crouch*, 566 F.2d 1311 (5th Cir.1975), made it clear that a reviewing court is barred from examining the mental processes of a judge not so much as a matter of privilege (which the judge could waive) but as a matter of institutional "role." As the court put it:

> The trial judge's statement of his mental process is so impervious to attack that even if he were to come forward today and declare that his memorandum misstated his reasons for the mistrial, we could not consider his explanation.... 'It is inappropriate ... to base an appellate opinion on assertions dehors the record.'

*Id.* at 1316 (citations omitted).

**43.** In this regard, it is significant that much of the frequently cited pre-*Morgan* Supreme Court *dicta* about the dangers associated with probing mental processes is in *res judicata* cases. See note 28, *supra*.

**44.** *Singer Sewing Machine Co. v. N.L.R.B.*, 329 F.2d 200 (4th Cir.1964), was an action challenging designation of a bargaining unit by the Board. Singer sought to introduce evidence that the controlling factor in the Board's selection of the bargaining unit was an invalid one and, in so doing, it also sought the testimony of an agency official. The agency resisted the subpoena, claiming the mental processes privilege.

Writing for the Fourth Circuit, Judge Winter noted:

> The mental process rule protects the secret mental processes of those who, acting in a judicial or quasi-judicial capacity, make decisions as to facts or as to law. See, e.g., *Chicago, B. & Q. R. Co. v. Babcock*, 204 U.S. 585 [27 S.Ct. 326, 51 L.Ed. 636] (1907). The rule has been applied to federal administrative officials who act in a quasi-judicial capacity, *United States v. Morgan*, 313 U.S. 409 [61 S.Ct. 999, 85 L.Ed. 1429] (1941); *Morgan v. United States*, 304 U.S. 1, 18 [58 S.Ct. 773, 776, 82 L.Ed. 1129] (1938); *DeCambra v. Rogers*, 189 U.S. 119 [23 S.Ct. 519, 47 L.Ed. 734] (1903); *Norris & Hirshberg v. Securities and Exchange Commission*, 82 U.S.App.D.C. 32, 163 F.2d 689, 693 (1947); *National Labor Relations Board v. Air Associates*, 121 F.2d 586 (2d Cir.1941); *Walled Lake Door Company v. United States*, 31 F.R.D. 258 (E.D.Mich.S.D. 1962).
>
> Although not urged on us by the Board, *United States v. Morgan*, 313 U.S. 409 [61 S.Ct. 999, 85 L.Ed. 1429] (1941), is often cited as a leading case stating and applying the mental process rule. We do not construe the language of this so-called fourth Morgan case as proscribing, under all circumstances, the probing of mental processes.

*Id.* at 206–07.

Based upon this analysis of the *Morgan* mental processes privilege, Judge Winter concluded that "the mental process rule is but one facet of the general presumption of regularity which attaches to decisions of administrative bodies." *Id.* at 208.

**45.** Occidental's Brief at page 5.

is inaccurate to say, however, that the many of the cases cited by the State.[46] It

**46.** *Chicago, Burlington and Quincy Railway Co. v. Babcock,* 204 U.S. 585 [27 S.Ct. 326, 51 L.Ed. 636] (1907), and *DeCambra v. Rogers,* 189 U.S. 119 [23 S.Ct. 519, 47 L.Ed. 734] (1903), are discussed in Note 28, *supra.*

In *Bacon v. Department of Housing and Urban Development,* 757 F.2d 265, 269 (Fed.Cir.1985), the court, relying upon *Morgan,* indicates that "the Supreme Court has unequivocably drawn the line against inquiring into the mental process of an agency head." The State highlights this sweeping language—far too sweeping (as my discussion of *Overton Park* shows) to be accurate, even in the pure *Morgan* context. But, even if the *Bacon* court's hyperbole were the rule, the court's statement of that rule would apply only to cases like *Bacon* itself, an Administrative Law challenge to a force reduction order issued by the Secretary of Housing and Urban Development. The reasons for the Secretary's action had been formally stated, and there was no indication of sham or subterfuge. In such circumstances, the *Bacon* court could say that "the function of review [in this court] is to determine whether the record supports the stated reasons or not." *Id.* at 270. And, the *Bacon* court's interpretation of the Supreme Court's precedents cannot be read more broadly.

In *Warren Bank v. Camp,* 396 F.2d 52 (6th Cir.1968), a state bank sought to enjoin issuance of a charter to a new national bank. The court, quoting *Morgan* at length, ruled that the state bank was not entitled to depose the Comptroller of the Currency regarding why he exercised his discretion as he did. *Id.* at 56–57. The Comptroller had conducted a full administrative hearing on the question, and the administrative files developed in the investigation and at the hearing were before the reviewing court. *Id.* at 53.

In *Tenneco Oil Co. v. Department of Energy,* 475 F.Supp. 299 (D.Del.1979), Tenneco sought judicial review of decisions issued by the Department of Energy. The court, though finding that the Government had not raised the claim of privilege with sufficient particularity in the case before it, clearly recognized the existence of the mental processes privilege. But the opinion limits its discussion of this privilege to the pure *Morgan* administrative review context. *Id.* at 316–19.

In *Brownko International v. Ogden Steel Company,* 585 F.Supp. 1432 (S.D.N.Y.1983), a challenge to an arbitration award, the challenger sought to call the arbitrators as witnesses so that they could explain their award. The court denied the request, saying that it is "well settled that an arbitrator cannot be examined for the purpose of impeaching his award." *Id.* at 1435. In reaching this conclusion, the court described *Morgan* as a case "fairly characterized as an effort by a litigant to overturn the ruling of the fact-finder involved." *Id.*

In *Montgomery Ward v. Zenith Radio Corporation,* 673 F.2d 1254 (Ct.Customs & Patent App. 1982), Zenith sought review of settlement agreements under which the Secretary of Commerce, the Secretary of the Treasury, and the Attorney general compromised claims against 22 importers. Zenith alleged that the Secretary of Commerce had no authority to settle claims for dumping duties and that, assuming the Secretary had such authority, the settlement agreements were entered into in bad faith. In the course of the litigation, Zenith served upon the Government interrogatories and a request for documents. The Government resisted, arguing that judicial review of the decision to compromise the claims against the importers should be limited to the record made by the agency. The trial court ruled that Zenith had made a sufficiently strong showing of bad faith to warrant discovery, and it directed the Government to respond. The Court of Customs and Patent Appeals reversed on the ground that, because Zenith had no statutory right to a hearing on the merits, the scope of judicial review with respect to the subject settlement agreement was limited to determining whether, in reaching the decision, the Government had satisfied the attendant procedural requirements. Though technically *Montgomery Ward* (which involves only document discovery) is not a mental processes case as I am using that term, the court cited *Morgan IV,* saying that *Morgan IV* "clearly rejected the argument that probing into reasoning or motivation was appropriate as part of a procedural inquiry." *Id.* at 1263, discussing *United States v. Morgan,* 313 U.S. 409 [61 S.Ct. 999, 85 L.Ed. 1429] (1941) (*Morgan IV*). In that context, the court added the language cited by the State to the effect that, in such a case, the party challenging compliance with procedural requirements "may not, however, be allowed to inquire into the merits of the settlement or into the Secretary's mental processes in deciding upon settlement in the guise of a challenge to procedure." *Id.* at 1264. It is evident that the court was citing the *Morgan* doctrine in the judicial review paradigm in which the doctrine was born.

The State cites one FOIA case which incorporates the pure *Morgan* Law privilege by reference. In *Kent Corp. v. NLRB,* 530 F.2d 612 (5th Cir.), *cert. denied,* 429 U.S. 920 [97 S.Ct. 316, 50 L.Ed.2d 287] (1976), the Fifth Circuit heard a FOIA request for investigative reports prepared by staff members of an NLRB Regional Office concerning alleged unfair labor practice charges. The court ruled that the reports in question were not "opinions" (in the sense of "orders") within the meaning of FOIA, but rather were springboards for discussion in the decisional process covered by Exemption 5 and the predecisional privilege. As the Court put it:

> Kent is trying to probe the mental processes and motives of the individual decision-maker, rather than to question the objective legal validity of the institutional decision. In the circumstances of this case, this effort is inconsistent with a basic principle of administrative law. The Supreme Court announced the gen-

eral bar against probing mental processes in the *Morgan* cases, and decisions of this Circuit have held it applicable to NLRB prosecutorial processes.

*Id.* at 620. The quoted passage leaves no doubt that the Fifth Circuit was incorporating the pure *Morgan* privilege (or doctrine) as developed in the context of judicial review.

The pure *Morgan* mental processes doctrine has been applied even in cases where, because the government sought to introduce the testimony, there technically was no privilege issue. Such cases provide powerful evidence that the power of the pure *Morgan* privilege derives from the notions of "role" and of efficiency, see text at notes 42 and 43, rather than from a perception that decisionmakers need the protection afforded by confidentiality. Given that fact, it is interesting that the State has cited language from three such cases—*Proffitt v. Wainwright,* 605 [685] F.2d 1227 (11th Cir. 1982); *Morrison v. Kimmelman,* 650 F.Supp. 801 (D.N.J.1986); and *Feller v. Board of Education,* 583 F.Supp. 1526 (D.Conn.1984).

In *Proffitt v. Wainwright, supra,* a federal habeas action challenging Proffitt's state court conviction and death sentence, the district court permitted testimony by the trial court judge on whether he had or had not considered a psychiatric report in imposing sentence. The Eleventh Circuit reversed:

> [T]he district court should not have considered the trial judge's post-decision statements concerning the influence various facts had on his decision. The judge's testimony was not limited to matters of basic, historical fact but directly addressed the effect of the psychiatric evidence on his sentencing decision. Such post-decision statements by a judge or juror about his mental processes in reaching decision may not be used as evidence in a subsequent challenge to the decision.

*Id.* at 1255. Of course, *Proffitt* is not a privilege case at all, since the Government put the judge on the stand. To the extent it is applicable to the mental processes privilege at all, however, it makes clear that the basis of the pure *Morgan* doctrine is *not* a perception that governmental decisionmakers need the protection provided by confidentiality.

*Morrison v. Kimmelman, supra,* a federal habeas action challenging Morrison's state court conviction for rape, is structurally identical to *Proffitt.* In *Morrison,* the State sought to present testimony from the trial judge indicating how he weighed certain evidence. The court refused to allow the testimony. Its explanation of this decision makes clear that the basis of the mental processes doctrine is a view of the relationship of decisionmakers and reviewing courts:

> Certainly, had petitioner been convicted by a jury, the respondent would not consider moving to have the individual members testify. This Court can find no principled basis for distinction between an inquiry into the

thought process of a single juror—that is, the judge—and a similar inquiry into the mental processes of all twelve jurors. The judge in a bench trial is, in effect, the sole juror. To draw an artificial distinction between bench trials and jury trials, and preclude testimony from the trier of fact in one but not the other, would not only unnecessarily burden the free exercise of the decision whether or not to waive trial by jury, but would also unduly prejudice the defendant in the present case.

> Further, similar considerations underlie the rule against probing the mental process of the jury and that of a trial judge. First, such testimony is inherently suspect. The risk of inaccuracy, in the opinion of this Court, outweighs any probative value such evidence might have. "The testimony is often given several years after the fact and a judge is unlikely to be able to reconstruct his thought processes accurately over such a span of time."

> Moreover, the fact that the state trial judge might be *willing* to testify is irrelevant to this consideration. Our concern with the accuracy and probative value of the testimony remains the same, irrespective of whether the testimony is voluntarily or involuntarily provided. Moreover, this Court is satisfied that if such testimony were admitted, the line between voluntariness and involuntariness would quickly become blurred. A petitioner against whom such evidence were introduced should, arguably, be entitled to cross-examination and discovery. Concerns with judicial immunity, comity, and independence would thus arise regardless of the circumstances which might have brought the testimony of the trier of fact into court.

> Finally, this Court is of the opinion that such an inquiry is prohibited by general consideration of judicial finality. When a verdict is rendered, neither the judge nor the jury is asked for justifications. The decision may be reviewed and reversed, modified or amended. However, the trier of fact is not to be placed on the witness stand and cross examined as to the reasons for the outcome, absent evidence of improprieties in the decision making process itself. If a judge seeks to give reasons for a decision, we are wiser for what is said on the record. However, once a judicial opinion is written and filed, we are all as expert in its interpretation as the hand that wrote it. It belongs to us all.

*Id.* at 806–07 (citations omitted).

In *Feller v. Board of Education, supra,* an appeal of a state administrative determination that a minor did not require special placement for his education and hence that the Board of Education was not responsible for tuition costs, the State sought to call the hearing officer who issued the ruling to testify. The attorneys for the minor moved to preclude that testimony on the ground that it was barred by the rule against probing the mental processes of decisionmakers. Citing *Morgan* and what it described as "hornbook administrative law," the court held

courts have confined the *Morgan* mental processes privilege to this judicial review paradigm—for some courts have applied the *Morgan* privilege where judicial review of administrative action was not the issue.

### B) *Application of the MORGAN Privilege Where Judicial Review of Administrative Action Is Not the Issue*

The case at hand is not within the judicial review paradigm that spawned the pure *Morgan* privilege (or doctrine). This case begins as an attempt by the Governments to recover money from OCC on the basis of several federal statutory and state law claims.[47] It continues with various defenses, counterclaims, and cross-claims. On every issue, the existence or non-existence of liability is to be determined *de novo* by the court—independent of any administrative findings, determinations, or rulings that may have been made about Love Canal. Various formal administrative decisions—and other less formal ones—are woven through the factual history of the case. But such decisions, whether formal or informal, have no *per se* legal force or effect on the claims involved here. And, no agency or governmental action is "under review" in any Administrative Law sense of that phrase.

Since this case does not fit the judicial review paradigm, the State has attempted to demonstrate that the *Morgan* privilege (or doctrine) is applicable where judicial review of administrative action is not the issue. In its brief and at oral argument, it has advanced several cases which it says

---

the testimony inadmissible. The court expressly noted that the Government was willing to waive the privilege in that case:

> The state defendants base their opposition to the motion on the premise that the mental processes rule has little or no application in a case where the officer is testifying voluntarily and the purpose of the testimony is not to contradict or impeach the record which has already been established.

*Id.* at 1529. Nonetheless, it concluded that the Government's argument was "supported neither by logic nor authority." *Id.* In the court's words:

> While it is true that the rule has generally been applied where the party adverse to the judgment or record calls an unwilling judicial or quasi-judicial officer for the purposes of contradicting or impeaching the record or demonstrating that the record is the result of confusion or impropriety on the part of the officer, it does not necessarily follow that the result is or should be ... different when the testimony of the judge or administrative officer is ostensibly offered to support the position sustained at the administrative level. On the contrary, except where the testimony is manifestly and uniquely probative and free of potential for violating the mental processes rule even during cross examinations, and where the independent objectivity of the administrative hearing is not undercut by the hearing officer subsequently becoming the advocate of the agency, the general preclusionary rule should be applied.

*Id.*

**47.** The Plaintiffs, the United States and the State of New York, seek recovery from OCC and its affiliates of the costs of responding to the release of chemicals from the Love Canal landfill. They also seek an order requiring OCC and its affiliates to perform certain additional remedial activities at or near the site. In addition, the State seeks recovery for damages to natural resources caused by the release of chemicals as well as punitive damages.

Both plaintiffs assert claims for recovery of costs under Section 107(a) of CERCLA. The United States also has asserted claims for restitution and injunctive relief under Section 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. sec. 6973, section 504 of the Clean Water Act, 33 U.S.C. sec. 1364, and Section 13 of the River[s] and Harbor[s Appropriation] Act [of 1899], 33 U.S.C. sec. 407.

In addition, the State seeks restitution of its expenditures as the costs of abating a public nuisance under the common law of the State of New York. The State also seeks punitive damages under CERCLA sec. 107(a), 42 U.S.C. sec. 9607(a), and the common law. Finally, the State has raised the common law claim of restitution.

OCC has counterclaimed against the United States and the State of New York for setoff or contribution on the grounds that they are both responsible parties under CERCLA and are liable for the alleged public nuisance. OCC has also cross-claimed against the City and the Board on the same basis. OCC's contentions against the United States are based upon the United States' alleged generation, ownership, and disposal of hazardous substances at Love Canal. OCC contends that the State, City, and School Board are liable because of their ownership and alleged maintenance of the Love Canal property. OCC further contends that the activities of the State, City, and School Board in constructing the Expressway, roads, sewers, utility lines, and the school were the sole cause of the release of hazardous substances at the Love Canal sites.

demonstrate that proposition. Chief among these cases is *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena.*[48]

In *Carl Zeiss,* the government asserted the deliberative and mental processes privileges to resist a subpoena commanding the production of Justice Department documents for discovery incidental to a civil case in which the Government was not a party. Judge Robinson began by discussing the "well established" privilege that "obtains with respect to intra-governmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."[49] He went on:

> This privilege, as do all evidentiary privileges, effects an adjustment between important but competing interests. There is, on the one hand, the public concern in revelations facilitating the just resolution of legal disputes, and, on the other, occasional but compelling public needs for confidentiality. In striking the balance in favor of nondisclosure of intra-governmental advisory and deliberative communications, the privilege subserves a preponderating policy of frank expression and discussion among those upon whom rests the responsibility for making the determinations that enable government to operate, and thus achieves an objective akin to those attained by other privileges more ancient and commonplace in character.[50]

But Judge Robinson went on to draw a connection between the deliberative privilege, classically defined, and the mental processes privilege (which he, like the State here, grounded in *Morgan* ):

> As important as are these considerations, the cases, analyzed critically, demonstrate that the immunity of intra-governmental opinions and deliberations also rests upon another policy of equal vitality and scope. *The judiciary, the courts*

declare, is not authorized *"to probe the mental processes"* of an executive or administrative officer. *This salutary rule forecloses investigation into the methods by which a decision is reached, the matters considered, the contributing influences, or the role played by the work of others* —results demanded by exigencies of the most imperative character. No judge could tolerate an inquisition into the elements comprising his decision—indeed, "[s]uch an examination of a judge would be destructive of judicial responsibility"—and by the same token "the integrity of the administrative process must be equally respected." Identically potent reasons dictate that protection no less extensive be afforded the processes by which the Attorney General's responsibilities for decisional and policy formulations, legal or otherwise, are discharged.[51]

Finally, he concluded:

> Inextricably intertwined, both in purpose and objective, are these two principles. The rule immunizing intra-governmental advice safeguards free expression by eliminating the possibility of outside examination as an inhibiting factor, but expressions assisting the reaching of a decision are part of the decisionmaking process. Similarly, the so-called "mental process rule" impresses the stamp of secrecy more directly upon the decision than upon the advice, but it extends to all phases of the decisionmaking process, of which the advice is a part. Each rule complements the other, and in combination they operate to preserve the integrity of the deliberative process itself. It is evident that to demand pre-decision data is at once to probe and imperil that process.[52]

On the "mental processes" privilege, Judge Robinson expressly made the point

---

**48.** 40 F.R.D. 318 (D.D.C.1966), *aff'd per curiam,* 384 F.2d 979 (D.C.Cir.), *cert. denied,* 389 U.S. 952 [88 S.Ct. 334, 19 L.Ed.2d 361] (1967).

**49.** 40 F.R.D. at 324 (citation omitted).

**50.** *Id.* at 324–25 (citations omitted).

**51.** *Id.* at 325–26 (citations omitted) (emphasis added).

**52.** *Id.* at 326 (citations omitted).

that it is applicable in circumstances other than those involved in *Morgan:*

> Although more usually applied in cases where an effort is made to challenge the determination itself, the proscription obtains with equal force where the decision is to be used only as a link in an evidentiary chain. "[T]he cerebrations and mental processes of government officials, leading to admittedly proper exercises of power, can never be a factor in a judicial proceeding and, therefore, need not be disclosed." [53]

The State is correct in asserting that the *Carl Zeiss* case advances its position. As noted, Judge Robinson apparently is willing to apply the mental processes privilege outside the judicial review paradigm. Nonetheless, the *Carl Zeiss* case does not establish the validity of the position taken by the State here.

Though Judge Robinson describes the deliberative privilege and the mental processes privilege as "inextricably intertwined" and as "complements" of each other, he does not explain *why* the mental processes of decisionmakers must be protected in cases where judicial review of administrative action is not the issue. He says that the mental processes rule "impresses the stamp of secrecy more directly upon the decision than upon the advice," [54] but he does not explain why the protection of the mental processes of decisionmakers enhances the quality of the decisionmaking process when the advice (a communication in service of a decision) already is protected by the deliberative privilege. And, he *neither* offers any reason why the rationales that justify the mental processes privilege (or doctrine) in the judicial review paradigm have force outside that paradigm *nor* offers any independent reasons why protecting the uncommunicated cerebrations of a decisionmaker will enhance the quality of the deliberative process.

In sum, though the State correctly cites *Carl Zeiss* in support of its position, the case does not establish the proposition that the mental processes privilege should apply in cases where judicial review of administrative action is not the issue. The deliberative privilege (applicable to communicated views) was sufficient to decide *Carl Zeiss,* and Judge Robinson offers no explanation why an independent mental processes privilege *should be sufficient* to decide the case before him (or cases like it not covered by the deliberative privilege). That Judge Robinson apparently believes that an independent mental processes privilege should be sufficient in such cases is helpful to the State's position; but the reasoning of the *Carl Zeiss* opinion does not help explain why the rule should be what the State wants it to be. [55]

At oral argument, the State also cited *Securities and Exchange Commission v. Perera Company,* [56] in support of its position. In that case, the Commission sought to enjoin activity of the defendant company which allegedly violated the Securities Act. The company argued that its activity was exempt from the relevant section of the Act and, alternatively, that it should not be held accountable for any violation that may have occurred because the SEC had knowingly distributed a deceitful publication in an attempt to entrap corporations into violating the Act. To help establish the latter contention, the company noticed the deposition of the official responsible for the allegedly deceitful release. In the course of considering the Government's motion for a

---

**53.** *Id.* at 329 (citing *Rosee v. Board of Trade,* 36 F.R.D. 684, 689 (N.D.Ill.1965).

**54.** *Id.* at 326.

**55.** Even if Judge Robinson's *ipse dixit* about the applicability of the mental processes privilege in the deliberative context were a completely satisfactory statement of what the law should be, the *Carl Zeiss* case would not establish the existence of the comprehensive mental processes privilege that the State is claiming in this case. The State, after all, claims that *all* mental processes of governmental decisionmakers are protected by the mental processes privilege—including opinions formed after the relevant decision is made. *Carl Zeiss* certainly does not stand for that proposition. At most, it stands for the proposition that the deliberative privilege and the mental processes privilege are coextensive. On such a view, post-decisional mental processes clearly are *not* protected.

**56.** 47 F.R.D. 535 (S.D.N.Y.1969).

protective order based upon a claim of "executive privilege," Judge Tenney wrote:

> The present motion seeks to prevent the taking of this deposition on the ground that it represents an unlawful attempt to explore the mental processes of a governmental official, which information falls within the protective confines of the "executive privilege."
>
> In the interest of promoting the free and candid interchange of ideas as a means to achieving effective executive decisions, it is generally not in the public interest to disclose its prefatory thinking as evidenced by intra-agency advisory opinions unless it is perfectly clear to the court that the production of such documents is essential to the proper presentation of the movant's case.[57]

Judge Tenney then granted the protective order on the ground that, because the defendant company had not relied on the government release, it had not shown a need to depose the government official.

57. *Id.* at 537.

58. The opinion in the case cited by Judge Tenney, *F. [E.] W. Bliss Company v. United States,* 203 F.Supp. 175 (N.D.Ohio 1961), is two paragraphs long and involves only application of the deliberative privilege to documents.

59. 524 F.Supp. 1381 (D.D.C.1981). At oral argument, the State *did* advance *Environmental Enterprises v. United States Environmental Protection Agency,* 664 F.Supp. 585 (D.D.C.1987), as an example of where the mental processes privilege was invoked successfully outside the administrative review context. Though the case involved an attempt to subpoena government officials in connection with pending civil litigation in which the government was not involved, it does not support the State's analysis of the mental processes privilege. The *Environmental Enterprises* court did quash the subpoena, but it did so because it did not comply with valid EPA regulations governing subpoenas of agency officials and because the EPA had not waived its right to sovereign immunity. *Id.* at 586. The EPA had asserted the mental processes privilege in the case, but the court did not invoke the privilege claim as a basis for its decision. The court's statement that "the documents sought in this case are clearly part of an on-going EPA determination and thus are entitled to protection," *id.,* is at most an alternative holding going to the deliberative privilege (covering documents) rather than to the mental processes privilege.

*Perera* clearly holds that the "executive privilege" may be invoked to prevent the deposition of a government official in an action which does not come within the judicial review paradigm. To that extent, it too advances the State's position. However, the meaning of the term "executive privilege" is unclear. The quoted passage (which represents the entirety of Judge Tenney's discussion of the issue) makes a reference to "mental processes;" but the discussion of the rationale underlying the privilege highlights the necessity of promoting an *exchange* of ideas—the rationale for the deliberative privilege. And, the one case cited by Judge Tenney is a deliberative privilege case.[58] In short, though the holding of the case is helpful to the State, *Perera* too does not advance an inquiry into what the scope of the mental processes privilege should be.

A significant case which neither the State nor Occidental cited in their briefs or at oral argument is *United States v. American Telephone and Telegraph,* the AT & T antitrust litigation.[59] In that case, AT &

At oral argument, Occidental also cited a case I do not find relevant to the issue at hand— *EEOC v. Los Alamos Construction,* 382 F.Supp. 1373 (D.N.M.1974). In that case, an employer against whom the EEOC was bringing an employment discrimination suit sought discovery from the agency. The EEOC resisted, claiming the "executive privilege." Judge Winner asserted that "It is now generally recognized that bureaucrats cannot hide behind a privilege claim unless national security or an overwhelming public interest demands that the agency be permitted to operate behind locked doors." *Id.* at 1375. He went on:

> Those unfortunate enough to be forced into litigation with the government still face agency insistence on trial by ambush, although, as we will see presently, Congress and the courts agree that a recognition of governmental privilege is the rare exception, while full disclosure is the almost universal rule. When the government or one of its agencies comes into court (with very few exceptions), it is to be treated in exactly the same way as any other litigant.

*Id.*

Asserting that "it seems to be endemic with government employees to say that their agency is in sanctimonious hot pursuit of a Holy Grail which immunizes them from the demands of fair play and the requirements of due process of law," *id.* at 1376, Judge Winner catalogued a series of cases in which the Government had been ordered to produce documents (principal-

T sought testimony from officials and employees of the Federal Communications Commission and of the Department of Justice. Citing *Morgan,* Judge Harold Greene refused to permit the testimony on several matters:

> In one such category are questions that tend to probe the mental processes of the individual members of the Federal Communications Commission, calling either for the reasons underlying various decisions of the Commission or for their understanding of what these decisions meant. These matters are part of the agency's deliberative process and as such are clearly privileged. As the Supreme Court has said, disclosure of intra-agency deliberations and advice is injurious to the government's consultative function because it would tend to inhibit the frank and candid discussion that is necessary for the effective operation of government.[60]

He continued:

> It may be noted in this connection that the public interest in preventing the disclosure of predecisional deliberations is greater at higher levels of decisionmaking. For example, presidential communications are presumptively privileged, while no such presumption applies to deliberations by lower level employees. It is more important that Commissioners feel free to exchange ideas during their deliberations without fear of disclosure than it is for lower echelon staff members to have that latitude, and a stronger showing of need for the information by defendants will therefore be necessary to compel testimony by the Commissioners.[61]

Judge Greene noted that, to the extent AT & T wished to use the testimony to show that it had acted reasonably in light of FCC decisions and policies, it could not do so. The reasonableness of AT & T's actions in response to the Commission's decisions "must be tested against the expressed views of the Commission (and perhaps the further illumination of these views by subsequent FCC or judicial decisions) not through the testimony of Commissioners."[62]

Moreover, Judge Greene refused to permit AT & T to question FCC witnesses broadly about the facts found by the Commission in its various opinions, in part, because "it would be difficult (if not impossible) to question [the witnesses] without at the same time opening up the deliberative

---

ly, in the cited cases, appellate conferee reports and field agent audits relevant to tax referral cases) which the Government had claimed were privileged. *Id.* at 1376–83. It is important to note, however, that in each of the cases cited by Judge Winner, the court ordering disclosure did so on the ground that the material sought was *factual* in nature and, hence, not within the scope of the deliberative or mental processes privilege. As one court put it: "Because the government's own affidavits state that the opinions written at the various levels are impartial and reflect the facts and law as the examiner finds them, I think nothing in them should unduly embarrass the government." *Id.* at 1381, citing *Abel Investment v. United States,* 53 F.R.D. 485, 490 (D.Neb.1971). Moreover, the material Judge Winner ordered disclosed also was factual in nature (for example, he ordered a full answer to an interrogatory requesting the names of persons having knowledge of the facts of the case).

As I read it, the *Los Alamos Construction* case is little more than additional authority for the proposition, accepted by all parties to this litigation, that factual material is not protected by the deliberative or mental processes privileges. Judge Winner does not address at all whether the mental processes privilege protects from discovery the opinions of the decisionmaker (contemporaneous to the decision or not), the identity of the factors weighed by the decisionmaker, the extent of the decisionmaker's deliberation, or any other elements of the decisionmaking process.

**60.** 524 F.Supp. at 1386–87 (citations omitted).

**61.** *Id.* at 1387 n. 18 (citations omitted).

**62.** *Id.* at 1387. As Judge Greene saw it: "Extrinsic evidence as to how and why the FCC reached its decisions and what it intended thereby—either by Commissioners speaking in their individual capacities or by employees of the FCC—are irrelevant to the question whether defendants' compliance was reasonable." *Id.* However, Judge Greene added: "If defendants are prepared to proffer that they were given contemporaneous advice by the Commission or one purporting to speak on its behalf with respect to the meaning of Commission decisions and that they relied thereon, the individual rendering such advice may be called to the stand." *Id.* at 1387 n. 21.

process of the Commission as a whole to judicial scrutiny," and, in part, because AT & T had already introduced so much evidence that it "will not be prejudicial if the FCC Commissioners are not permitted to testify." [63]

Judge Greene expressly based his holding in *AT & T* on several grounds—the mental processes and deliberative privileges, irrelevancy, and that AT & T did not need the evidence it sought. There is no denying, however, that the mental processes privilege was a substantial factor in his decision. At the very least, *AT & T* provides the same support for the State's argument that *Carl Zeiss* and *Perera* provide—to wit, it applies the mental processes privilege outside the judicial review paradigm.

In fact, *AT & T* is a bit more helpful to the State's argument than are *Carl Zeiss* and *Perera*. To be sure, the *AT & T* opinion (like the *Carl Zeiss* and *Perera* opinions) justifies application of the mental processes privilege by reference to the rationale underlying the deliberative process (for example, Judge Greene says that disclosure would be "injurious to the government's *consultative function* because it would inhibit the frank and candid *discussion* that is necessary for the effective operation of government") without explaining *why* such a rationale justifies protection of *uncommunicated* thoughts. But, the *AT & T* opinion (unlike the *Carl Zeiss* and *Perera* opinions) offers an independent rationale for applying the mental processes privilege in cases where judicial review of administrative action is not the issue:

"Questioning the individual Commissioners as to the factual basis each had for the findings he supported would not be unlike examining the Commission's decision to determine whether it was supported by substantial evidence. Such an inquiry is a matter for the court charged by statute with the review of final FCC action ... and it is not within the jurisdiction of this Court." [64] Put another way, Judge Greene's point is that a litigant should not be permitted to do collaterally what he could not have done directly. And, since the FCC Commissioners could not have been questioned about their mental processes in a proceeding reviewing their decision, the FCC Commissioners should not be questioned about their decision in a lawsuit outside that context.

Taken in its pristine form, this feature of the *AT & T* opinion is, as I have indicated, helpful to the State's position; but, helpful as it is to the State, it does not resolve the issue at hand. The point made adds a new twist to the debate, but, without elaboration, it remains a bare assertion that the mental processes rule should apply outside the judicial review paradigm. Judge Greene does not say *why* a litigant should not be able to probe the mental processes of decisionmakers in a lawsuit where they are relevant simply because those mental processes could not be probed on judicial review of the decision. There is a link missing in the argument: There is no demonstration that the reasons which militate against probing the mental processes of decisionmakers in the latter context are present in the former one.[65]

---

63. *Id.* at 1388. Still, Judge Greene observed that the government could not assert its privilege and still rely upon the testimony of FCC employees in support of its case. *Id.* at 1385 & n. 12. And, he permitted AT & T to elicit testimony both about allegations of improper or undue influence upon the Commission (on the ground that the privilege did cover such testimony) and about matters put in issue by the government to which AT & T was entitled to respond and about which the agency's witnesses were significant sources of evidence (on the ground that, though the testimony was within the scope of the privilege, AT & T's interest in such evidence was sufficient to overcome the privilege). *Id.* at 1389–91.

64. *Id.* at 1388.

65. A case the State cited both in its brief and at oral argument, *Rosee v. Board of Trade of the City of Chicago*, 36 F.R.D. 684 (N.D.Ill.1965), provides yet another twist on this theme, though it too offers no explanation of its conclusion that the mental processes of decisionmakers should not be discoverable in litigation (outside the judicial review paradigm) where they are relevant. *Rosee* was an action alleging that the Board of Trade and two employees of the Commodity Exchange Authority had conspired wrongfully to deprive Rosee of membership on the Board and to destroy his business and reputation. The two employees of the Authority

Not every case relied upon by the State or discovered by me supports application of the mental processes privilege outside the judicial review paradigm represented by

*Morgan* itself.[66] For example, one case which the State cites in support of its contention that such application of the mental processes privilege is necessary to ensure

allegedly falsified records and reports to their superiors to advance the conspiracy. Rosee served a deposition subpoena duces tecum on the head of the Authority's Chicago office for documents prepared or examined by the two employees. The Authority resisted the request, invoking the deliberative and mental processes privileges.

Judge Will began by noting that "the processes of discovery should not be used to force an official to disclose the reasoning or other considerations which lie behind a decision he was fully authorized to make." *Id.* at 689. Indeed, he asserted that "the cerebrations and mental processes of government officials, leading to admittedly proper exercises of power, can never be a factor in a judicial proceeding and, therefore, need not be disclosed." *Id.* In his view, the principle stemmed from the proposition that, where a party has a grievance with an authorized policy, the party's remedy is not to the courts but to the legislature:

> Where the grievance stems from an authorized decision or determination of policy, the citizen is directed to seek redress in the legislative forum. The judicial power cannot be used to determine the efficacy of legitimate governmental policy.

*Id.* at 689.

Judge Will went on to note that the case before him was *not* one where a party merely was protesting the wisdom of an authorized decision. *Id.* ("The grievance does not stem from a determination of policy. It arises from alleged misconduct by government officials. The forum for redress is not the legislature, it is the courts. Plaintiff does not seek to examine the factors which entered into an official's exercise of discretion; he hopes to show that two subordinate government agents wilfully conveyed false information to their superiors. His inquiry is not directed simply to the subjective evaluation which these agents gave to the charges he made. He believes that he can show that his allegations were corroborated by other evidence obtained by the agents and that such evidence was either ignored or suppressed in such a manner as would raise a presumption of inexcusable misfeasance or knowing participation in a conspiracy to injure him.") Thus, while emphasizing that he was not suggesting that "litigants may, simply by alleging official misconduct, traverse an otherwise appropriate claim of privilege for government documents," *id.* at 690, he permitted discovery in the case before him.

66. Another case which neither the State nor Occidental cited in their briefs or at oral argument is *Davis v. Braswell Motor Freight Lines,* 363 F.2d 600 (5th Cir.1966). In that case, an action by a labor union against an employer,

the Fifth Circuit reversed a district court order compelling the regional director of the National Labor Relations Board to testify about (and produce documents showing) the opinions of the regional director and the agency's General Counsel concerning the probable validity of various charges of unfair labor practices made by the employer and the union prior to the Board's publication of its decision. Though the basis of the court's holding was that the employer had not complied with Board regulations controlling testimony and disclosure by officials, the panel went on to discuss the deliberative and mental processes privileges.

Judge Thornberg began by noting that subpoena at issue "attempts to examine the processes and reasoning of the Board and the General Counsel's office in reaching their conclusions prior to their official publication." *Id.* at 604. Then, after quoting *Morgan* at length, he added:

> The reasons for the rejection of any attempts to delve into the decisionmaking process of an administrative agency are even more imperative than those which induced the Supreme Court to condemn the investigation of the Secretary of Agriculture. In the words of the Third Circuit:

He went on to quote the Third Circuit's opinion in *N.L.R.B. v. Botany Worsted Mills,* 106 F.2d 263, 267 (3d Cir.1939) (citations omitted):

> The essence of the discussion of a common cause and the judgment ensuing upon that discussion must lie in freedom of expression. If those present during the discussion are aware that their sentiments, either tentative or final, may be revealed by their fellow participants, it is clear that caution or worse would remove all candor from their minds and tongues. The logic of this position requires the preservation from questioning of each member of the general body. * * *
>
> As a matter of policy * * *, we think that efficient deliberation by a quasi-adversary, such as the Labor Board, is even more necessary than efficient deliberation by a neutral, such as a judge or a jury. Furthermore, since the litigants before the Labor Board are legion, the evil of harassment * * * is correspondingly multiplied. The function of deciding controversies might soon be overwhelmed by the duty of answering questions about them.

Though *Braswell* is yet another case extending the mental processes privilege outside the judicial review paradigm, neither it nor the case it quotes (*Botany Worsted Mills*) discusses whether the rationale for the mental processes privilege has force in cases where judicial review of administrative action is not the issue.

effective government is Judge Weinstein's opinion in *United States v. Schipani.*[67] In fact, *Schipani* illustrates that often it is not only appropriate but also necessary to probe the mental processes of government officials.

Joseph Schipani was prosecuted and convicted for tax evasion. At the suggestion of the Solicitor General, however, the Supreme Court vacated the conviction because tainted evidence probably had been used to obtain the conviction. The case was remanded to the district court for a new trial, should the Government seek to prosecute anew. When the Government instituted *Schipani II,* the defendant moved to dismiss on the ground that the entire case was fatally blemished in that a saturation investigation had been ordered on the basis of the illegally acquired evidence. Judge Weinstein ruled that the entire prosecution might have to be vitiated if the decision to focus the investigation was based on the tainted evidence, and that the burden was on the Government to prove that its decision to focus the investigation was not based substantially on tainted evidence.[68] Having made that decision *in the abstract,* he addressed the nature of the burden of proof borne by the Government as it tried to show that *in the concrete* the intensity of its investigation was not sub-

stantially affected by tainted evidence.[69] He concluded that the Government did not have to advance proof beyond reasonable doubt on this point—that it need advance only proof by a preponderance of the evidence.

As he weighed the appropriate burden of proof, Judge Weinstein wrote that "courts should avoid wherever possible making detailed inquiries into the reasons for executive decisions and examining communications among high officials which are the basis of their exercise of judgment."[70] This is the passage quoted by the State in support of its contention that the mental processes privilege is necessary to ensure effective government. However, nowhere in *Schipani*—not even in the quoted passage—does Judge Weinstein imply that litigants should not be allowed to probe the mental processes of officials. Indeed, much of the *Schipani* opinion is devoted to an analysis of the decisionmaking process which led to the saturation investigation of Schipani—albeit an analysis on a preponderance standard.[71] Stripped to its essence, the *Schipani* case is a striking instance where the basis for the decisionmaker's action and the factors that led to particular action are the heart of the case.[72]

In this regard, *Schipani* is not an isolated case.[73] It is striking that there are

67. 289 F.Supp. 43 (E.D.N.Y.1968).

68. *United States v. Schipani,* 289 F.Supp. 43, 61–63 (E.D.N.Y.1968).

69. *Id.* at 64.

70. *Id.* at 64.

71. *Id.* at 46–53, 64–65.

72. Judge Weinstein's warning that courts should "avoid *wherever possible* making *detailed* inquiry" into the reasons for executive decisions is based at least in part on "the practical consideration that it is often impossible for a highly placed official to analyze or remember the varied emotional and intellectual reasons for a decision." *Id.* at 64. Such a practical consideration clearly militates in favor of the lower "preponderance" standard and against requiring the "detailed inquiry" inherent in a "beyond reasonable doubt" standard. But it equally clearly admits the possibility of inquiry into an official's mental processes where his or her memory is capable of recalling details.

73. I discovered cases where courts held the mental processes privilege inapplicable outside the judicial review paradigm. For example, in *Machin v. Zuckert,* 316 F.2d 366 [336], 340 (D.C. Cir.), *cert. denied,* 375 U.S. 896 [84 S.Ct. 172, 11 L.Ed.2d 124] (1963), a court held that the "opinions" and "conclusions" of Air Force mechanics who investigated possible defects in a propeller mechanism after a crash are *not* protected by the deliberative privilege because "[t]heir investigations and reports would not be inhibited by knowledge that their conclusions might be made available for use in future litigations ..." *Id.* at 340.

A second example is *Amoco Production Company v. Department of Energy,* 29 Fed.R.Serv.2d (Callaghan) 402 (D.Del.1979). In that case, the court permitted discovery of the contemporaneous interpretations by agency officials of a Department of Energy ruling (both before and after promulgation of the ruling) in order to clarify the meaning of the ruling. The court permitted discovery because in view of the technical expertise of agency officials and their exposure to industry practice, "the statements and

literally dozens of litigation contexts wherein courts and litigants routinely examine the mental processes of government officials. For example, in determining the constitutionality of statutes and acts of public officials, the Supreme Court in recent years increasingly has directed the inquiry to the subjective purposes of governmental decisionmakers. The Court has deemed inquiry into legislative and administrative purposes to be relevant or essential in cases arising under the due process,[74] bill of attainder,[75] free exercise,[76] and establishment[77] clauses, as well as more recently under the equal protection,[78] freedom of speech,[79] and commerce[80] clauses and perhaps the fifteenth amendment.[81] The Court has also considered evidence of legislative purpose relevant in a commerce clause challenge to a state highway regulation.[82] The Court has held that in some instances a finding of illicit purpose itself is sufficient to invalidate the challenged statute or administrative action.[83]

Indeed, the testimony of government decisionmakers often is essential to plaintiffs' meeting their burden of proof where a required element of that burden is proof of

actions of these administrators have been considered significant even in the absence of an approval of their views by the agency, qua agency." *Id.* at 405. The court continued:

Similar considerations apply to evidence reflecting the views of agency personnel who have participated in the development of the disputed regulation. Their expertise and knowledge make their interpretation of regulatory language during the developmental stage of substantial value in resolving the construction question in much the same way that Congressional committee proceedings are of value in determining legislative intent. But in this area there are countervailing considerations which are not present in the case of post-promulgation evidence emanating from the implementation and enforcement period. This consideration underlies the executive privilege which protects the agency's deliberative process.

*Id.* In denying the government's request for a protective order based upon the deliberative and mental processes privileges, the court volunteered:

[A]pplication of this privilege requires a balancing which can only be done with reference to specific documents or specific deposition questioning.... [F]or present purposes it will suffice to say that the public interest in an inhibited decisional process does not bar all inquiry into pre-decisional matters.

*Id.*

74. *E.g., Kennedy v. Mendoza–Martinez,* 372 U.S. 144 [83 S.Ct. 554, 9 L.Ed.2d 644] (1963).

75. *See Fleming [Flemming] v. Nestor,* 363 U.S. 603 [80 S.Ct. 1367, 4 L.Ed.2d 1435] (1960).

76. *See, e.g., Walz v. Tax Commission,* 397 U.S. 664 [90 S.Ct. 1409, 25 L.Ed.2d 697] (1972) [1970].

77. *E.g., Marsh v. Chambers,* 463 U.S. 783 [103 S.Ct. 3330, 77 L.Ed.2d 1019] (1983); *Lemon v. Kurtzman,* 403 U.S. 602 [91 S.Ct. 2105, 29 L.Ed. 2d 745] (1971); *Epperson v. Arkansas,* 393 U.S. 97 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968); *Abing-*

ton School District v. Schempp, 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844] (1963).

78. *E.g., Rogers v. Lodge,* 458 U.S. 613 [102 S.Ct. 3272, 73 L.Ed.2d 1012] (1982); *City of Mobile v. Bolden,* 446 U.S. 55 [100 S.Ct. 1519, 64 L.Ed.2d 47] (1980); *Personnel Administrator v. Feeney,* 442 U.S. 256 [99 S.Ct. 2282, 60 L.Ed.2d 870] (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 [97 S.Ct. 555, 50 L.Ed.2d 450] (1977); *Washington v. Davis,* 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976); *Keyes v. School District No. 1,* 413 U.S. 189 [93 S.Ct. 2686, 37 L.Ed.2d 548] (1973). One court has ruled that it is proper to examine a prosecutor's intent to determine if his exercise of peremptory challenges was racially discriminatory. *Willis v. Zant,* 720 F.2d 1212, 1220 (11th Cir.1983), *cert. denied,* [467 U.S. 1256,] 104 S.Ct. 3546 [82 L.Ed.2d 849] (1984).

79. *Board of Education v. Pico,* 457 U.S. 853, 891 [102 S.Ct. 2799, 2820, 73 L.Ed.2d 435] (1982).

80. *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662 [101 S.Ct. 1309, 67 L.Ed.2d 580] (1981).

81. *See City of Mobile v. Bolden,* 446 U.S. 55 [100 S.Ct. 1519, 64 L.Ed.2d 47] (1980) (plurality opinion); *see also Rogers v. Lodge,* 458 U.S. 613, 619 n. 6 [102 S.Ct. 3272, 3276 n. 6, 73 L.Ed.2d 1012] (1982) (expressing no view on relevance of purpose to cases arising under fifteenth amendment); *Gomillion v. Lightfoot,* 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960) (same).

82. *E.g., Rogers v. Lodge,* 458 U.S. 613 [102 S.Ct. 3272, 73 L.Ed.2d 1012] (1982).

83. *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 670–71 [101 S.Ct. 1309, 1316, 67 L.Ed. 2d 580] (1981). Justice Brennan noted that both his opinion and the majority's opinion "have found the actual motivation of the Iowa lawmakers ... highly relevant to, if not dispositive of, the case." *Id.* at 683 n. 3 [101 S.Ct. at 1322–1323 n. 3] (Brennan, J., concurring). *See also Epperson v. Arkansas,* 393 U.S. 97 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968).

the motivation of the defendant. And, in fact, courts have repeatedly required testimony by decisionmakers as to the motives for their decisions in just such cases. The line of cases applying the principles set forth by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*,[84] is illustrative. In *Mt. Healthy*, a case involving the termination of an untenured teacher, allegedly for exercising his First Amendment rights, the Court established the respective burdens of proof of the parties. The Court ruled that the plaintiff has the initial burden of establishing that his constitutionally protected conduct was a "substantial factor" in the Board's decision not to rehire him. Once this burden was met, the Board had the burden of establishing that "it would have reached the same decision as to respondent's re-employment even in the absence of the protected conduct."[85]

These types of cases do not appear in the literature on the mental processes privilege for two reasons. First, they obviously do not fit within the judicial review paradigm; and, second, extension of the *Morgan* privilege to shield the mental processes at issue in them is so palpably inappropriate that the government does not raise the privilege. Nonetheless, that courts routinely probe the mental processes of decisionmakers is significant, whatever the nature of the cases wherein the probing is done. It demythologizes the mental processes privilege, focusing the inquiry precisely.

Properly focused, the inquiry can be stated simply. Where an action involves judicial review of administrative action, *Morgan* teaches that courts ordinarily should not probe the mental processes of government officials; however, in cases where judicial review of administrative action is not the issue, courts should or should not probe the mental processes of government officials *depending upon* whether the rationales which spawned the mental processes privilege in the judicial review paradigm (or new considerations) justify its application.

No case discussed thus far has addressed this focused inquiry. The limited number of cases recognizing the mental processes privilege outside the judicial review paradigm have done so without discussing explicitly whether the principles which support the mental processes privilege in that paradigm have force outside that paradigm —and without discussing whether new principles support application of a mental processes privilege. The opinions in those cases tend to conflate the deliberative privilege and the mental processes privilege, making them coextensive, without establishing that the rationales underlying the two privileges are coextensive.

Moreover, the cases extending the mental processes privilege outside the judicial review paradigm do not exist in a vacuum. Clearly, courts routinely examine the mental processes of government decisionmakers in many types of cases outside the Administrative Law context—and the

---

**84.** 429 U.S. 274 [97 S.Ct. 568, 50 L.Ed.2d 471] (1977).

**85.** 429 U.S. at 287 [97 S.Ct. at 576]. In applying these standards, the lower courts have repeatedly compelled or heard the testimony of public officials as to their motives in making the challenged determinations. *E.g., De Choudens v. Government Development Bank of Puerto Rico,* 801 F.2d 5, 7 (1st Cir.1986) (president of bank testified as to his reasons for demoting plaintiff); *Avery v. Homewood City Board of Education,* 674 F.2d 337, 341 (5th Cir.1982) (Superintendent of Education examined and cross-examined concerning reasons for teacher's discharge); *Ayers v. Western Line Consolidated School District,* 691 F.2d 766, 768–69 (5th Cir. 1982) (principal testified at court hearings as to reasons for his decision not to rehire teachers);

*Jones v. Dodson,* 727 F.2d 1329, 1332 (4th Cir. 1984) (defendant sheriff testified to reasons for his discharge of plaintiff); *Jett v. Dallas Independent School District,* 798 F.2d 748, 758 (5th Cir.1986) (plaintiff's immediate supervisor "conceded in his trial testimony that [plaintiff's] published remarks were a 'substantial factor' in his decision to recommend [plaintiff's] removal"). *See also Jefferson v. Hackney,* 406 U.S. 535, 547 [92 S.Ct. 1724, 1732, 32 L.Ed.2d 285] (1972) (Supreme Court upheld finding of fact by district court that "[t]he depositions of Welfare officials conclusively establish that the defendants did not know the racial make-up of the various welfare assistance categories prior to or at the time when the orders here under attack were issued").

government does not raise a claim of privilege to block the examination. Thus, it is evident that the law does not protect the mental processes of *all* governmental decisionmakers. And, it is equally evident that, if the mental processes privilege protects the mental processes of *any* governmental decisionmakers outside the judicial review paradigm, the justification for such protection is not articulated clearly in any case discussed above.

### C) *Possible Justifications for Applying the MORGAN Privilege Where Judicial Review of Administrative Action Is Not the Issue*

Given the commitment of our procedural system to openness and broad disclosure, it is well established that testimonial privileges are to be construed as narrowly as possible,[86] and that the party invoking the privilege bears the burden of demonstrating its applicability.[87] Therefore, unless there is a clear justification for applying the mental processes privilege in cases outside the judicial review paradigm, the privilege should not be applied.

The most frequently mentioned justification for the deliberative privilege—that confidentiality enhances the decisionmaking process by fostering a full and frank exchange of ideas—does not appear to justify the mental processes privilege. Because the mental processes privilege protects the thoughts and cerebrations of various officials (whether communicated or uncommunicated), the protection it provides is not directed at an *exchange* of ideas.[88]

A simple set of examples highlights this point. Given the existence of the deliberative privilege, a decisionmaker cannot be asked: "As you and your associates were making the decision, what opinions did they

express?" And he cannot be asked: "What opinions did you express to them?" The deliberative privilege protects the exchange of ideas that occurs as part of the decisional process. But many questions to the decisionmaker would not penetrate the *exchange* of ideas. For example, a litigant might ask the official: "What was your opinion on this subject?" Thus, the crucial inquiry is whether there is any reason that our evidentiary rules (and specifically the mental processes privilege) should prevent a litigant from asking a decisionmaker that question or a question like it. In other words, the inquiry is whether there is a reason to protect *not* just the communication (or the fact of communication), but the thoughts and opinions themselves.

The two justifications which support application of the mental processes privilege in the *Morgan* judicial review paradigm have little force outside that paradigm. While it may be "out of role" for an official whose administrative ruling is under review to testify as a witness on his decision, it is not "out of role" for an official to give evidence in litigation (frequently where the government is a party) where his testimony is relevant and where the law places upon the court the burden of both gathering the facts and adjudicating the merits of the dispute.

So, also, the efficiency rationale which justifies the mental processes privilege in the judicial review context has no force in cases where judicial review of administrative action is not the issue. Of course, subjecting officials to questions about their opinions and decisions consumes time they could be spending doing their duty. But, the "inefficiency" that arises simply from the fact of official testimony is of a different kind from that which would be created

---

**86.** 8 J. Wigmore, Wigmore on Evidence, secs. 2191–2192 (McNaughton rev. ed. 1961). This general principle has been applied as well to privileges designed to foster efficiency in government work and to enhance the governmental decision-making process. *See, e.g., Murphy v. Tennessee Valley Authority,* 571 F.Supp. 502 (D.D.C.1983); *Nationwide Mutual Insurance Co. v. Friedman,* 451 F.Supp. 736 (D.Md.1978).

**87.** *See, e.g., In re Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867 [94 S.Ct. 64, 38 L.Ed.2d 86] (1973); *Burke v. New York City Police Department,* 115 F.R.D. 220, 231 n. 8 (S.D.N.Y.1987); *Apex Oil Company v. DiMauro,* 110 F.R.D. 490, 493–94 n. 3 (S.D.N.Y.1985); *Gulf Oil Corporation v. Schlesinger,* 465 F.Supp. 913, 916 (E.D.Penn.1979).

**88.** See pages 16 and 18 *supra,* and notes 25, 26, and 27 *supra.*

if the mental processes privilege were not available in the *Morgan* judicial review paradigm. In the judicial review context, the inefficiency comes from altering the balance between administrators and courts in a way which undermines the very purpose of delegated authority. The "inefficiency" that arises from the fact of official testimony is simply a cost of litigation. Saying that the absence of a privilege makes litigation more costly for the government does not justify application of a privilege.[89]

### Justifications Based Upon the Effects of Exposing Changes in Position

One set of possible justifications for the mental processes privilege flows from the nature of the testimony which might be sought in the absence of the privilege. Presumably, a decisionmaker who approaches a problem thoughtfully occasionally will find that his position changes as his thinking matures. Perhaps the change will be stark; perhaps it will be merely a matter of emphasis. In any event, a healthy decisionmaking process should encourage such change where it is appropriate. If there is no mental processes privilege, however, a decisionmaker could be asked: "What was your view of the proposed policy on October 10?" And, so on month by month, or day by day. If he had changed his mind—once, twice, or many times—as he struggled with the proposed policy or with his position on it, such questioning would expose his internal struggle. By some accounts, this might be undesirable.[90]

It could be argued that, without the mental processes privilege, decisionmakers would be less prone to consider alternatives and would be more likely to make snap judgments. A decisionmaker who wishes to be viewed as decisive might be reluctant to weigh alternatives or to entertain arguments for and against a policy, out of concern that this weighing of options could be mistaken for indecisiveness. Or, a decisionmaker who wants people to think that

**89.** It could be argued that, absent the mental processes privilege, a different kind of inefficiency might arise. On this view, sophisticated parties might institute collateral litigation in order to obtain information that is privileged in the judicial review context. Then, once the party possessed the information, a reviewing court might be reluctant to bar its use even in the case where judicial review of the administrative action *was* the issue. This might result in an end run around the *Morgan* privilege.

This argument is without merit. There is little evidence to support the claim that litigants will attempt to circumvent the *Morgan* privilege in this way. And, even if some litigants would attempt circumvention, courts could deter continuation of the practice by sanctions in cases where the collateral private litigation is frivolous, and by exclusionary rules in cases where an attempt is made to introduce the testimony in the judicial review context.

**90.** At oral argument, the Federal Government cited *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854 (D.C.Cir.1980), in support of the Government's interpretation of the mental processes privilege. In that case, Coastal States sought to obtain through FOIA copies of agency interpretations of its regulations which had not been made public, particularly memoranda from regional counsel to field auditors issued within the context of particular facts encountered during audits. Invoking Exemption 5, the agency withheld the requested materials as documents which would not be subject to disclosure during discovery. The heart of the agency's argument was that these opinions were not "formal" interpretations of the regulations, because there was a published procedure for issuing such interpretations and because the opinions were not binding on the audit staff. Rather, in the agency's view, the documents were preliminary communications protected by the attorney-client privilege, the work product rule, and the *deliberative* privilege.

The district court found that the opinions were regularly and consistently followed by staff—and that in some offices the opinions were indexed and used as precedent. And, the district court rejected the agency's arguments that the opinions were privileged. The Court of Appeals affirmed. In discussing the deliberative privilege, Judge Wald, writing for the Court of Appeals, described the documents:

The documents do not contain subjective, personal thoughts on a subject, so public knowledge of the documents will not subject the writer either to ridicule or criticism.

*Id.* at 869.

The Federal Government draws from these words the notion that the *Coastal States Gas* court recognized the importance of allowing government officials to change positions as they struggle with the decision. In the government's words, decisionmakers should be able to engage in "uninhibited evaluations within themselves without fear of public criticism or ridicule." Transcript of February 11 Oral Argument at pages 31–32.

he has good instincts might be less willing to change his mind, if by doing so he runs the risk of having his change of position thrown up to him at a later date.

It also could be argued, for reasons quite independent of how the decisionmaker wants to be perceived, that government benefits from a public perception that decisionmakers are strong and decisive, or that they are at least confident of what they decide. Such a perception, it might be said, increases public respect for government generally and adds authoritativeness to the decisions reached. If decisionmakers are forced to testify about how their opinions changed over time, it might compromise these values.

This set of arguments does not justify a mental processes privilege outside the *Morgan* judicial review paradigm. It is unlikely that decisionmakers will refrain from considering alternatives or that they will make snap judgments because they fear that, at a deposition conducted years after the decision is made, they will be exposed as indecisive. Job incentives, status, peer respect and a host of other factors should be sufficient to motivate decisionmakers to make the best decision possible. The business of decisionmakers is to make the best decisions possible. Their careers depend upon how well they do that.[91] These incentives and the need to achieve institutional objectives should sustain the decisionmaking process against the remote risk of occasional compelled disclosure.

Any independent interest the government might have in preserving an illusion that governmental decisionmakers do not struggle with their decisions is illegitimate. In a democracy, the presumption is that the processes of government should be open and officials should be judged as they are (not as they would like to be perceived). Moreover, creating the illusion that difficult decisions are made easily is a disservice both to government and to the public.

### Justifications Based Upon the Relationship of the Official to Others in the Deliberative Unit

Another set of justifications for the mental processes privilege flows from the relationship of the officials to others—sometimes superiors, sometimes coworkers. For example, it could be argued that the relationship of administrative officials and their superiors in government bars the subordinates from publicly exposing their thoughts without the consent of their superiors. On this view, a superior has a right to expect a subordinate official to keep his views to himself (or within the deliberative unit), except as he (the superior) directs the subordinate official to divulge them to others. The superior may want his subordinates to remain silent to avoid the risk that several voices—different perhaps only in nuance—might distort public understanding of policy, or might breed confusion about it. Or, the superior simply may want to avoid the embarrassment of having his own people on record opposing his views. In either case, it could be argued that if the superior does not have such a right to demand silence from his subordinates, he might choose not to risk being embarrassed publicly by a dissenting subordinate—and that, to avoid that risk, he might surround himself with persons unlikely to hold dissenting opinions, a result with undesirable consequences for the decisionmaking process.

It also could be argued that forcing an official to reveal even his own thoughts might compromise his long-term ability to work with his co-workers in the decisionmaking process. On this view, the mental processes privilege is designed in part to protect the official from being forced to announce dissenting views that will embarrass colleagues. By providing protection, the privilege preserves the official's long-term capacity to operate effectively and collegially in the decisionmaking process.

---

91. A deliberative privilege may be necessary to get officials to exchange ideas, because individual career goals may not always be tied to participation in a full and frank exchange. This does not mean, however, that a mental processes privilege is necessary to motivate officials to think as well as they can about the decisions they must reach. Individual career goals always are tied in some way to the quality of work produced.

In other words, the claim is that the alternative—forcing the official to voice his disagreement publicly—would undermine his position as part of the decisionmaking team.

These arguments (like the ones discussed previously) ignore the considerable incentives that exist, independent of the privilege, to motivate decisionmakers to make good decisions. It is unbelievable, for example, that a superior would surround himself with advisors of one view, thereby sacrificing the input of others, simply to avoid the risk of being embarrassed in the few cases where a dissenting advisor later might be forced to testify as to the disagreement between them.[92]

In another respect, these arguments assume that government actors (be they superiors or coworkers) should be assisted in presenting to the public a picture of unity (either between the superior and his subordinates or between coworkers in the decisional process) which is an illusion. This simply is not a fair assumption in a democracy, and the thrust of considerable legislation in recent years (such as FOIA, the Sunshine Act, and their state counterparts) is to the contrary.

### Justifications Based Upon Institutional Concerns

A third set of justifications for the mental processes privilege flows from the nature of the very process by which, in the absence of the privilege, the information sought will be obtained—to wit, questioning officials about their decisions. On this view, a notion of institutional integrity underlies the mental processes privilege—a sense that the institutions of government are entitled to a degree of deference and formality. The idea is that we want governmental decisions depersonalized and institutionalized. Where a federal court permits inquiry into the mental processes of federal officials, this concern sounds in separation of powers. Where it permits inquiry into the mental processes of state officials, it sounds in comity. In either case, the essence of the argument is that there is something unseemly in the spectre of subjecting officials to the degradation and, possibly, harassment that might accompany detailed examination under oath on their opinions.[93]

It could be argued that this concern is not simply an abstract one—that there will be very deleterious effects on governmental institutions. Subjecting government officials to such questioning (with the inevitable second-guessing involved) would force those contemplating careers in government to weigh yet another cost before deciding upon such careers. Moreover, given the likelihood that at least in some cases officials will not be able to remember or fully reconstruct their mental processes, the spectacle might shake public confidence in the official (or in government generally) without justification.

While both effects might be viewed as troubling, the notion that it is unseemly and degrading to "subject" officials to examination on their opinions seems based on assumptions about government which I already have described as wrongheaded.

---

92. Undeniably, examples come to mind of leaders who have surrounded themselves with advisors all of one view; but such leaders did not do so out of a fear that their advisors would later become deponents, and such leaders would have done so whether or not a mental processes privilege was recognized.

93. Judge Weinstein referenced this point in *In re Franklin National Bank Securities Litigation, MDL 196,* 478 F.Supp. 577, 581 (E.D.N.Y.1979) (citations omitted):

A subsidiary theory supporting the official information privilege relies upon a related, though still distinct principle: "The judiciary ... is not authorized 'to probe the mental processes' of an executive or administrative officer." This principle forbids judicial investigation into "the methods by which a decision is reached, the matters considered, [and] the contributing influences or the role played by the work of others." Unlike the first ground, which rests upon pragmatic considerations of efficiency and effectiveness, this second justification draws upon constitutional considerations, derived from the doctrine of separation of powers.

Though the State concedes that there is no separation of powers issue here, Transcript of February 11 Oral Argument at 34, there remains a concern sounding in a need for institutional integrity.

And, problems of harassment, if they occur, can be handled with remedies (such as sanctions) that are readily available.

The idea that questioning officials about their views will have a deleterious effect on government institutions also is ill-founded. Potential government officials who would choose not to serve in government because their is a possibility that they will be questioned about their opinions probably do not belong in government. And, the public is unlikely to be disturbed at all by those few cases where government officials in good faith are unable to reconstruct their original views—so long as government is open as a general matter.

### Justifications Based on the Deliberative Process

In the end, the strongest argument for extending the mental processes privilege to cases outside the *Morgan* judicial review paradigm is the existence of the deliberative privilege.[94] In the absence of a mental processes privilege, each participant in a deliberative unit could be asked his personal views on the various matters which *might* have been discussed as part of the deliberation. The deliberative privilege would bar inquiry into *whether* the particular participant communicated his personal views as part of the deliberative process. And, of course, it would bar inquiry into what others said. Nonetheless, in the absence of a mental processes privilege, by questioning each participant in the deliberative unit, a questioner could infer the nature of the entire conversation that the deliberative process is designed to conceal. *In this sense*, the mental processes privi-

lege is a necessary counterpart to the deliberative privilege.

This point was made by the court in *A.O. Smith v. Federal Trade Commission.*[95] In that case, the FTC's lawyers sought to employ the deliberative and mental processes privileges as a "one-way" ratchet, allowing government officials to divulge the contents of their own advisory communications to others but not allowing the witnesses to relate the responses they received. The court disagreed, on the ground that a "one-way" privilege would vitiate the privilege in its entirety:

> The Commission [argues] that little damage to the public interest occurs when a government employee is permitted to reveal the substance of his (or her) communications, as long as the employee is prevented from divulging the communications of others. This view of executive privilege is unacceptable. The purpose of this privilege is to promote frank and honest discussion within government agencies during the formulation of policy. If the privilege only attached to what one *hears* from others, as opposed to what one *says* to others, the privilege would be rendered meaningless since the purpose behind the rule would have evaporated. Moreover, given the Commission's view of the privilege in this context, one could always discover the total content of various intra-agency communications simply by deposing every participant to a particular conversation and obtaining information as to what that individual communicated to others.[96]

This point may be what Judge Robinson had in mind when in *Carl Zeiss* he referred to the mental processes privilege as "inex-

---

**94.** Candor requires recognition that some of the points I have made while discussing (and dismissing) possible justifications for the application of the mental processes privilege outside the judicial review paradigm also might be made in a discussion of the deliberative privilege. For example, though I believe that already existing incentives and the need to achieve institutional objectives should sustain the decisionmaking process against the remote risk of occasional compelled disclosures, I must acknowledge that such arguments, to some extent, undermine the need for *both* the deliberative privilege and the mental processes privilege.

Grounds not applicable to the mental processes privilege are available to justify the deliberative privilege, however. And, regardless of how one would assess those grounds, it is well settled that the deliberative privilege is available in a case like this one. Thus, the deliberative privilege can provide a solid starting point for analysis of the mental processes privilege.

**95.** 403 F.Supp. 1000 (D.Del.1975).

**96.** *Id.* at 1018–19.

tricably intertwined, both in purpose and objective" with the deliberative privilege and then added: "Each rule complements the other, and in combination they operate to preserve the integrity of the deliberative process itself."[97]

So also, this point may have been in Judge Tenney's mind when, in *Securities Exchange Commission v. Perera Company*,[98] he invoked the *mental processes privilege* in refusing to order the deposition of an SEC official "in the interest of promoting the free and candid interchange of ideas as a means to achieving effective executive decisions."

Given that the deliberative privilege has been recognized as necessary for effective government, and given that the deliberative privilege clearly applies in cases (like the one at hand) in which judicial review of administrative action is not the issue, if it is so that the mental processes privilege is a necessary complement to the deliberative privilege in such cases, then the mental processes privilege should apply in such cases. I believe that the mental processes privilege is justified on this ground.

D) *The Scope of the Mental Processes Privilege in Cases Where Judicial Review of Administrative Action Is Not the Issue*

If the justification for the existence of the mental processes privilege is that it complements the deliberative privilege, its scope and application is coextensive with the scope and application of that privilege.[99]

The deliberative privilege applies only to communications that are part of a decisionmaking process. It does not apply to the "opinions" or "conclusions" of those not part of that process. It does not apply to purely factual material, or to statements that summarize facts. Furthermore, the deliberative privilege does not apply to descriptions of the agency's policy after it has been adopted, to pre-decisional documents that are incorporated into the agency's final decision, or to post-decisional material which evaluates the decision. Each of these limitations must apply to the mental processes privilege as well.

One point bears elaboration, because I anticipate that it will be more often an issue where the mental processes privilege is being applied than it is where the deliberative privilege is being applied. It is well settled that the deliberative privilege does not protect the product of the deliberative process—the decision. So also the mental processes privilege does not protect that product. It makes no difference whether the decision is written, unwritten, or partly written and partly unwritten. At the point where the deliberative process comes to an end, the protection of both privileges comes to an end. Thus, a document containing the decisionmaker's final position would not be protected by the deliberative privilege; a contemporaneous oral statement made by him to the other members of the deliberative unit would not be protected by the deliberative privilege; and his contemporaneous thoughts and opinions (even if not communicated to the other members of the deliberative unit) would not be protected by the mental processes privilege. Nothing in the rationales that support either privilege warrants protecting these matters.

The same concept can be put another way. At a certain point, when the decisionmaker comes to rest, the decisionmaking process comes to an end. The decisionmaker's views at that point are his final position. It makes no difference whether those views are written or unwritten.[100]

97. *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss Jena*, 40 F.R.D. 318, 326 (D.D.C.1966), *aff'd per curiam*, 384 F.2d 979 (D.C.Cir.), *cert. denied*, 389 U.S. 952 [88 S.Ct. 334, 19 L.Ed.2d 361] (1967).

98. 47 F.R.D. 535, 537 (S.D.N.Y.1969).

99. See text at pages 14–16, *supra*.

100. Parenthetically, the concept discussed in text highlights the distinction between cases (like *Morgan*) involving judicial review of agency action and cases (like the one at hand) in which such review is not the issue. In the judicial review context, there is a presumption (concededly an artificial one made in service of the efficiency sought by delegating authority to agencies) that the written record produced by

The point just made obviously applies only to persons with (at least *de facto*) decisionmaking authority. The deliberative process does not end when a subordinate reaches a final position. Of course, once the decisionmaker has reached a conclusion and the process is over, the post-decisional views of subordinates about that decision are not within the scope of the privilege.

Defining the scope of the mental processes privilege does not end the matter. Just as the deliberative privilege is not an absolute privilege, so also the mental processes privilege is not an absolute privilege. Thus, even material concededly within its scope sometimes must be disclosed. Whether particular material within its scope must be disclosed is determined by a balancing test which turns upon the nature of the allegedly protected material and the context of the specific litigation. In this case, Chief Judge Curtin has ruled that most material falling within the scope of the deliberative privilege should *not* be disclosed. He noted one important exception, however, OCC has the right to obtain any material which, though falling within the scope of the privilege, explicitly evidences the State's concern for the possible political ramifications of the Love Canal situation (or other factors unrelated to the health and safety of those living or working near Love Canal) and which suggests various actions in light of these political ramifications (or other factors unrelated to the health and safety of those living or working near Love Canal). These rulings should govern application of the mental processes privilege as well.

### III. *Application of the Ruling in Specific Instances Thus Far Presented*

The Appendix to this Ruling contains 40 excerpts from the transcripts of Doctor Axelrod's and Doctor Whalen's depositions, each excerpt an instance where the State invokes the mental processes privilege. To illustrate the applications of the principles announced in this Ruling, I now will apply these principles to each of the 40 instances.

In some cases, I indicate a need for a proffer of proof by the State. Where I have made that indication, the State should submit by May 15, 1988, for *in camera* review a proffer identifying the decision which was the product of the deliberative process creating the claim of privilege, describing the deponent's role in that deliberative process, and outlining the substance of the deponent's testimony in a manner which, in good faith, takes care to mention anything arguably bringing the testimony (or any part thereof) within one of the categories of otherwise privileged information which nonetheless, in this case, should be released.

*Item # 1:* The mental processes privilege does not apply. A deponent's post-decisional opinions are not within the scope of the privilege.

*Item # 2:* The mental processes privilege appears to apply. The questions which are not answered probe pre-decisional mental processes. The State should make the required proffer of proof.

*Item # 3:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item # 4:* It is not clear whether Doctor Clifford's views (and hence Doctor Whalen's reactions to them) were articulated before or after the decision. The State should make the required proffer of proof.

*Item # 5:* The mental processes privilege does not apply. The privilege does not prevent the examiner from asking the witness whether or not he recollects something. The deliberative privilege (not the mental processes privilege) may prevent the examiner from asking the content of the recollection—depending upon the con-

---

the agency is the only relevant matter. Only in cases where the record is so inadequate that it frustrates review (like *Overton Park*) do courts go behind the record. On the other hand, in cases in which judicial review of agency action

is not the issue, and where the court (in discovery or at trial) is sitting to determine the rights of aprties by finding facts as accurately as possible, truth is the object—and there is no reason to truncate factfinding artificially.

text in which the reports were made (if made), their content, and other factors.

*Item # 6:* The deliberative privilege protects what was said to Doctor Whalen in the pre-decisional situation, and the mental processes privilege protects his understanding of those statements. No proffer of proof is necessary here because the context provided by the transcript is sufficient.

*Item # 7:* The mental processes privilege does not apply. The material sought is factual.

*Item # 8:* The mental processes privilege does not apply, because the question probes whether or not Doctor Whalen presently would be surprised. However, the question need not be answered because whether he would be surprised is clearly irrelevant and argumentative.

*Item # 9:* The mental processes privilege does not apply.

*Item # 10:* The mental processes privilege appears to apply. The State should make the required proffer of proof.

*Item # 11:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete. ·

*Item # 12:* The mental processes privilege does not apply. The information sought appears to be factual. To the extent it seeks more, it is still unprotected, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item # 13:* Either the deliberative privilege or the mental processes privilege may apply, but it is difficult to make that assessment on this record. The State should make the required proffer of proof.

*Item # 14:* The mental processes privilege does not apply.

*Item # 15:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item # 16:* The mental processes privilege appears to apply. No proffer is necessary because the context is clear.

*Item # 17:* The mental processes privilege appears to apply. No proffer is necessary because the context is clear.

*Item # 18:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item # 19:* The mental processes privilege does not apply, to the extent that the question seeks Doctor Whalen's present evaluation of material. The question does not invade the deliberative process.

*Item # 20:* The mental processes privilege does not apply, to the extent that the question seeks Doctor Whalen's present evaluation of material. The question does not invade the deliberative process.

*Item # 21:* The mental processes privilege does not apply. The information sought simply asks clarification of an answer already given.

*Item # 22:* The information sought in the first question (Do you know why that was one that they considered?) is protected by the deliberative privilege. The information sought in the second question (Did inhalation pose the primary risk to the residents of Love Canal?) is not privileged because it only seeks Doctor Whalen's present views on the matter.

*Item # 23:* The information sought does not appear to come within the scope of the privilege. To the extent the question seeks to elicit a present interpretation of the document, neither the deliberative privilege nor the mental processes privilege applies. If the State wishes to make a proffer of proof to support application of the privilege on some other grounds, it may do so.

*Item # 24:* The information sought does not appear to come within the scope of the privilege. To the extent the question seeks to elicit a present interpretation of the document, neither the deliberative privilege nor the mental processes privilege applies.

If the State wishes to make a proffer of proof to support application of the privilege on some other grounds, it may do so.

*Item #25:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item #26:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item #27:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item #28:* The mental processes privilege appears to apply.

*Item #29:* The mental processes privilege does not apply. The question elicits purely factual information.

*Item #30:* The deliberative privilege protects the sources of the information. The other question (Can you explain why it does not?) is not protected, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item #31:* The mental processes privilege does not apply. The questions seek purely factual information.

*Item #32:* The mental processes privilege does not apply. The questions seek either purely factual material or Doctor Whalen's *present* assessment of the consistency of such material and a statement in the exhibit. Such inquiry does not invade the deliberative process.

*Item #33:* The mental processes privilege does not apply. The first question elicits purely factual information. The second question merely asks whether a final decision was reached.

*Item #34:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete. Indeed, these questions seem to probe only his present views.

*Item #35:* The deliberative privilege appears to apply, except insofar as the question seeks purely factual material. The State should make the required proffer of proof.

*Item #36:* The mental processes privilege does not apply. The question seeks Doctor Whalen's present opinion of the consistency of Doctor Axelrod's expressed view and unprivileged factual data.

*Item #37:* The mental processes privilege does not apply, so long as the question seeks merely the deponent's *final* but unwritten views. Once the decisionmaker has come to rest, the deliberative process is complete.

*Item #38:* The mental processes privilege does not apply. The information is purely factual.

*Item #39:* The information sought in the first question (see (A) p. 59) and the second question (see (B) p. 60) is protected by the deliberative privilege. The information sought by the other two questions does not appear to be connected to the deliberative process; these questions appear to request only an explanation of a speech.

*Item #40:* The information sought in the first two questions is protected by the deliberative privilege. The third question (see (C) p. 60) is not protected; it merely seeks to determine whether the Department ever reached a conclusion on an issue.

\* \* \* \* \* \*

It is my hope that these forty specific determinations will guide the parties as they apply the general principles outlined in this Ruling. If any party wishes me to reconsider one or more of the specific rulings, I will do so if the party submits by May 15 a request for reconsideration which details the reasons why that party believes the specific ruling is inconsistent with the general principles contained in this opinion. When appropriate, a proffer of proof should be provided.

## IV. Procedures Applicable to the Mental Processes Privilege in This Case

I have ruled that the mental processes privilege does apply in this case, but that it is limited in scope. If our experience in applying the deliberative privilege forecasts in any way what our experience will be as we implement this Ruling, the parties sometimes may disagree whether a particular question calls for an answer covered by the mental processes privilege. Therefore, so that discovery may proceed as expeditiously as possible, with due regard to the rights of the respective parties, I establish the following procedure to cover cases where the parties do not agree on the application of the mental processes privilege.

### Option #1

The parties may proceed with the deposition as they did with Doctor Whalen's deposition. In other words, under Option #1, the deponent's attorney directs its witness not to answer the question, and the questioning party moves to compel an answer based upon the transcript of the testimony. If Option #1 is chosen, I should be provided with a copy of the transcript and an offer of proof by the deponent's attorney identifying the decision which was the product of the deliberative process creating the claim of privilege, describing the deponent's role in that deliberative process, and outlining the substance of the deponent's testimony in a manner which, in good faith, takes care to mention anything arguably bringing the testimony (or any part thereof) within one of the categories of otherwise privileged information which nonetheless, in this case, should be released. The transcript should be provided to me as usual; the proffer of proof should be sealed and delivered to me just as documents have been sealed and delivered to me in the past for *in camera* inspection. The deadline for submission of the proffer of proof is the day that the transcript is delivered.

### Option #2

At the discretion of any party, instead of proceeding under Option #1, the deposition may recess briefly and, after the recess, proceed in a manner similar to a deposition upon written questions. In other words, under Option #2, the questioning party propounds a series of questions to the reporter, which questions the reporter then asks the deponent with only the deponent, the deponent's attorney, and the court reporter present. At the end of the testimony, the deponent or the deponent's attorney must identify the decision which was the product of the deliberative process creating the claim of privilege and describe the deponent's role in that deliberative process. The record of that testimony, including the supplemental material, is sealed and submitted to me with the transcript of the rest of the witness's testimony for that day.

### Option #3

At the discretion of any party, instead of proceeding under Option #1 or Option #2, the parties may telephone me for a ruling. Under Option #3, the deponent's attorney must be prepared to provide to me (if necessary, *in camera*) an identification of the decision which was the product of the deliberative process creating the claim of privilege describing the deponent's role in that deliberative process, and briefly outlining the substance of the deponent's testimony—in a manner which, in good faith, takes care to mention anything arguably bringing the testimony (or any part thereof) within one of the categories of otherwise privileged information which nonetheless should be released. If Option #3 is chosen by a party, I may choose nonetheless to have the parties proceed under Option #1 or Option #2.

John Sexton
JOHN SEXTON
Special Master

April 30, 1988.

### APPENDIX TO RULING

#### ITEM #1

January 19 Axelrod Deposition at pages 349–351

MR. YABLONSKI: [In Exhibit 19] you write the uncertainty could, conceivably, be

eliminated by making the zero level of contamination a function of the probable risk level. What does that mean?

DR. AXELROD: That you could remove that uncertainty by—by accepting the assumption that you would permit only a zero risk. In other words, accept no risk and therefore, you would have defined with absolute certainty what it is that you were prepared to accept.

MR. YABLONSKI: In your view, is that a realistic proposition?

MR. MARTIN–LEFF: Objection.

[Conference between the witness and Mr. Martin–Leff]

MR. MARTIN–LEFF: This question goes to the deliberative process of defining, as a matter of policy, an appropriate risk level. And we object on the grounds of deliberative privilege.

MR. YABLONSKI: The privilege involves a communication, what's the communication?

MR. MARTIN–LEFF: In this case, you are probing ... the mental processes of a participant in the decision-making process.

MR. YABLONSKI: What decision?

MR. MARTIN–LEFF: This witness participated in decisions with respect to this kind of issue at Love Canal. And a question as to his opinion at this time probes mental processes of a participant at that time and is covered by the deliberative process privilege.

MR. YABLONSKI: [W]hat you're saying is that we can't ask questions of any State employees that are opinion.

MR. MARTIN–LEFF: You can't ask questions of opinion.

MR. YABLONSKI: No, no. The privilege protects the communication of an opinion to somebody else. I'm not asking Dr. Axelrod whether he told someone else that his view on his subject was X, Y, or Z, I'm simply asking him today what is his view and I think that's an entirely different subject and entirely different question.

MR. MARTIN–LEFF: It's our position by probing his view today, you will invade the decision-making process that this same witness participated in at the time of the decision and communicated his views and therefore, it would destroy the deliberative privilege to permit this kind of inquiry.

ITEM #2

Whalen Deposition at pages 15–17

MR. YABLONSKI: Well, with regard to Love Canal, was it Dr. Axelrod's practice to provide you with analytical results of samples taken at the Love Canal?

MR. MARTIN–LEFF: Objection as to form. You may answer.

DR. WHALEN: The answer to that would be yes.

MR. YABLONSKI: And what would you do with the—with the data when you received it?

MR. MARTIN–LEFF: Objection. That question, which is completely unrestricted in time and context of the process that Dr. Whalen was involved in, could implicate the mental processes of Dr. Whalen in making policy decisions on Love Canal, and under the authority of U.S. v. Morgan, we consider the mental processes of the witness to be privileged. And I will instruct the witness not to answer that question.

MR. BOOTE: I'd like the question read back, please.

(The above-requested question was then read by the reporter.)

(Conversation between Mr. Boote and Mr. Martin–Leff.)

MR. YABLONSKI: Would you interpret the data, Doctor?

MR. MARTIN–LEFF: Same objection, same instruction.

MR. YABLONSKI: Are you qualified to interpret chemical analytical data?

MR. MARTIN–LEFF: You may answer the question.

DR. WHALEN: I am not qualified as a toxicologist. I believe I am qualified, when competent people explain the situation to me, to assessing the situation.

MR. YABLONSKI: And when Dr. Axelrod would provide the data to you, would

he just provide you with raw data, or would he provide you with some assessment?

MR. MARTIN–LEFF: Objection. Same objection, same instruction.

MR. YABLONSKI: I'm not asking for what the assessment was, I'm asking was there an assessment.

MR. MARTIN–LEFF: Well, here we're talking about the communications from Dr. Axelrod to Dr. Whalen, and because of the open-ended nature of the question, we could be talking about deliberative communications on policy matters.

MR. YABLONSKI: The question was only whether there was—anybody did—ever did any assessment of the data. Did anybody ever interpret the data? I—I fail to see how this can possibly be privileged. I didn't ask for what—what the assessment was. I asked for whether there was an assessment—

MR. MARTIN–LEFF: All right. You may answer yes or no.

MR. YABLONSKI: —provided to you.

MR. MARTIN–LEFF: You may answer yes or no.

DR. WHALEN: Yes.

### ITEM #3

Whalen Deposition at page 20

MR. YABLONSKI: What was the Department of Health's point of view on the chemical findings at Love Canal?

MR. MARTIN–LEFF: The Department of Health has published written assessments as to those questions, and I'm not going to permit this witness to offer his own supplementary thoughts about those documents.

MR. YABLONSKI: Why not? On what basis? I mean, if his—I'm asking him his recollection, what was the Department of Health's point of view.

MR. MARTIN–LEFF: I believe that inquiry would probe the mental processes of the chief decision maker for the State of New York in the assessment of risk at Love Canal in 1978, and we rely on the Morgan case and its progeny for the mental process rule.

### ITEM #4

Whalen Deposition at pages 37–38

MR. YABLONSKI: Did Dr. Clifford ever tell you he thought it was a mistake to issue that order?

DR. WHALEN: Oh, I believe Dr. Clifford had made his point of view known.

MR. YABLONSKI: What was his point of view—

DR. WHALEN: Early on.

MR. YABLONSKI: —as you understood it, Dr. Whalen?

DR. WHALEN: I think Dr. Clifford's point of view was that this was a public health nuisance that should be handled on a very low-key level and that it was not a major problem....

MR. YABLONSKI: Did you agree with that?

MR. MARTIN–LEFF: Objection. [I'm] not going to permit this witness' thought processes on that policy question to be examined. [I] instruct you not to answer.

### ITEM #5

Whalen Deposition at page 61

MR. YABLONSKI: Do you know whether anyone ever concluded as a result of their investigations that the Canal was at one time open to the river?

DR. WHALEN: No, I did not.

MR. YABLONSKI: Do you know—do you have any recollection of anything that anybody concluded about the geology of the Love Canal area?

MR. MARTIN–LEFF: Objection. That question with its broad scope would also go to mental processes of the witness, and I instruct the witness not to answer.

### ITEM #6

Whalen Deposition at pages 62–64

MR. YABLONSKI: ... Do you recall any facts about the geology of the Love Canal area, anything?

DR. WHALEN: Yes.

MR. YABLONSKI: Okay, what—tell us what you do recall about it.

DR. WHALEN: Well, I remember that there were conclusions drawn as to the permeability of the soil and that as one got down, one came to an—to a layer that was impervious to water. The engineers or geologists or someone described it as an overflowing bathtub, when one would get too much moisture within this geology, leading it to overflow, in essence, as an overflowing bathtub. That's about all I remember.

MR. YABLONSKI: How deep was the layer of more permeable soils, as you recall?

DR. WHALEN: Well, I think there were two layers. I think there was a short upper layer which was permeable, then a semi-permeable layer, and then an impermeable layer. The actual depths I can't recall.

MR. YABLONSKI: Where did you get this information, Dr. Whalen?

DR. WHALEN: I don't know.

MR. YABLONSKI: Do you recall who first mentioned to you the bathtub theory?

DR. WHALEN: No, I do not.

MR. YABLONSKI: What is your understanding of the bathtub theory?

MR. MARTIN–LEFF: Objection. Obviously, this witness is not going to be a primary source of evidence on geology or hydrogeology in this case. To the extent that the questions nevertheless seek this witness' understanding and inferences from that kind of information, I believe the question is probing his mental processes as a decision maker with respect to health threats at Love Canal, and I will instruct him not to answer the question.

MR. YABLONSKI: Okay. Well, I'm not asking him for his theory. I'm asking him for what he understood the bathtub theory —I understood it was reported to him by somebody else. What did he understand them to be saying about it. And you're going to instruct him on that basis?

MR. MARTIN–LEFF: That is correct.

MR. YABLONSKI: And the reason is the deliberative privilege? Is that—

MR. MARTIN–LEFF: That's right.

Whalen Deposition at pages 73–74

MR. YABLONSKI: [Richards Exhibit 30 says] committee members discussed points such as were representative samples taken. Do you know the answer to that question? Were representative samples at Love Canal taken?

MR. MARTIN–LEFF: Objection. Mental processes principle.

MR. YABLONSKI: Well, this is a fact question.

MR. MARTIN–LEFF: I instruct you not to answer.

MR. YABLONSKI: Did the Department of Health ever determine what the air was in the houses?

MR. MARTIN–LEFF: Objection as to form. May I hear the question again?

(The above-requested question was then read by the reporter.)

MR. MARTIN–LEFF: You mean whether the air was contaminated?

MR. YABLONSKI: What was in the air in the houses.

MR. MARTIN–LEFF: You may answer.

DR. WHALEN: I don't know what houses Dr. Richards is referring to, and with that limitation I can certainly say that extensive sampling was done of air of houses in ring one and ring two surrounding the Canal. Whether these are the same homes he's talking about I don't know.

Whalen Deposition at page 74

MR. YABLONSKI: Were any samples taken in ring one homes other than in the basements, to your knowledge?

DR. WHALEN: I believe there were.

MR. YABLONSKI: Do you know how many homes were sampled in other areas of the house?

DR. WHALEN: No, I don't know the exact number of samples.

MR. YABLONSKI: Would it surprise you if only one?

MR. MARTIN–LEFF: Objection to whether he'd be surprised. Mental processes rule.

### ITEM # 9

Whalen Deposition at pages 79–80

MR. YABLONSKI: Do you have expertise in the area of risk assessment?

DR. WHALEN: I do not.

MR. YABLONSKI: Do you understand the subject of risk assessment?

MR. MARTIN–LEFF: Objection. Mental process rule.

MR. YABLONSKI: Now, Gene, I'm trying to get clear whether the witness feels capable of discussing the subject. If ... this is something that's alien to him and he really doesn't understand it, we can shortcut a lot of the examination. I don't think it's the mental process rule. I'm not getting into any decision-making on Love Canal or anything else. I'm just asking him does he feel confident to understanding the subject matter of risk assessment.

MR. MARTIN–LEFF: I appreciate your clarifying that, but I have to stand by that objection.

### ITEM # 10

Whalen Deposition at page 84

MR. YABLONSKI: What was the purpose of Exhibit number 4? Why did you write to Dr. Clifford?

DR. WHALEN: Why did I write to Dr. Clifford?

MR. MARTIN–LEFF: Objection. This document speaks for itself, and the inquiry in going beyond the—what the document itself says is an inquiry into the mental processes of the witness, and I instruct him not to answer.

### ITEM # 11

Whalen Deposition at pages 85–86

MR. YABLONSKI: Well, did you ever tell anybody that 25 houses and a school were—were affected by potentially dangerous vapors from the chemicals?

DR. WHALEN: Oh, at a given point in time I did, yes.

MR. YABLONSKI: Is the number 25 correct?

DR. WHALEN: No. I think the only time I ever put a number on it was when I talked about ring one, which I don't even recall the number of houses in ring one. But I don't—I have no idea where 25 came from.

MR. YABLONSKI: Your recollection is that all of the homes were potentially affected? That is, all the ring one homes?

DR. WHALEN: Let's see. This—the date of this is, I assume, April 25th, April 26th. I would assume I didn't know at that point in time.

MR. YABLONSKI: Well, but subsequently, did you determine that all of the ring one homes were affected?

MR. MARTIN–LEFF: Objection. The determination that Dr. Whalen made is recorded in his August 2nd, 1978 order, which does define an area at risk, and—and certain other documents which have been provided to Occidental, and further examination on this issue is an incursion into his mental processes.

### ITEM # 12

Whalen Deposition at pages 125–126

MR. YABLONSKI: Did—did the Department of Health have any kind of background data with which to compare Love Canal data?

DR. WHALEN: Background—

MR. YABLONSKI: Either for ambient air—

DR. WHALEN: In Niagara Falls or—

MR. YABLONSKI: Or air in the homes? Yes.

MR. MARTIN–LEFF: Objection. We're now talking about the range of information that was before the decision maker, and we object to the question on the grounds of mental process rule.

MR. YABLONSKI: Well, I'm asking a factual question. Was there background data available, published data that they had available? Was there in 1978 background published data for homes, what one would expect to find in a typical home?

MR. MARTIN–LEFF: I instruct the witness not to answer.

MR. YABLONSKI: Was there available background outdoor air data?

MR. MARTIN–LEFF: Same objection, same instruction.

ITEM # 13

Whalen Deposition at pages 147–148

MR. YABLONSKI: Now [I] hand you a document that was marked as Exhibit number 5 in the Huffaker deposition, a memo from Drs. Bush and Richards to Dr. Axelrod concerning a visit at the Love Canal June 26 and 27, 1978.

DR. WHALEN: Yes.

MR. YABLONSKI: Did you see this document at or about the time it was written?

DR. WHALEN: That I could not say.

MR. YABLONSKI: Do you have any recollection of any of the matters discussed in here?

DR. WHALEN: I have recollections of the matters discussed in there, yes.

MR. YABLONSKI: Do you recall that, in fact, homes with no sumps were free from chemical odor, with the one exception that's noted in the first paragraph under basements?

DR. WHALEN: I remember that there was a difference in homes with sumps and without sumps.

MR. YABLONSKI: Did the Department of Health subsequently conclude that the homes with sumps were contaminated and the homes without sumps were not contaminated?

DR. WHALEN: I do—

MR. MARTIN–LEFF: Objection. Mental processes. I instruct the witness not to answer.

MR. YABLONSKI: Did the Department of Health ever issue a report concluding that homes with sumps were contaminated, homes without sumps were not?

DR. WHALEN: I'm not certain of that. I think that we probably did make statements saying that homes with sumps were more contaminated than those without sumps.

MR. YABLONSKI: Do you recall making such statements?

DR. WHALEN: I remember discussing it. Whether actual statements were made or not, I don't know.

ITEM # 14

Whalen Deposition at page 152

MR. YABLONSKI: Are you familiar with the concept of breakthrough volume in air sampling?

DR. WHALEN: Break—

MR. MARTIN–LEFF: Objection. Mental processes.

MR. YABLONSKI: Have you ever heard the subject breakthrough volume?

MR. MARTIN–LEFF: Same objection.

ITEM # 15

Whalen Deposition at page 156

MR. YABLONSKI: You'll notice Dr. Kim's comments [see Kim Exhibit 13, a memo from Doctor Kim to Doctor Axelrod on a June 1978 visit to Love Canal] about the school.

DR. WHALEN: Yes.

MR. YABLONSKI: Are those comments correct, so far as you know?

MR. MARTIN–LEFF: Are you talking about a variety of passages or just this page one, second paragraph below item four?

MR. YABLONSKI: Well, let's break it down. Is it consistent with your—your recollection that the school did not seem to be a problem?

MR. MARTIN–LEFF: Objection. The question is addressed in the August 2nd order, and I will instruct the witness not to answer on the grounds that it inquires into the mental processes of a state official.

ITEM # 16

Whalen Deposition at page 168

[Mr. Yablonski showed Dr. Whalen Richards Exhibit # 22, which contained a list of 21 questions or criticisms about an air sampling report. Mr. Yablonski questioned about Exhibit # 22.]

MR. YABLONSKI: Were you aware of these criticisms?

MR. MARTIN–LEFF: Objection. Mental processes privilege. Instruct the witness not to answer.

### ITEM # 17

#### Whalen Deposition at page 169

MR. YABLONSKI: ... [Do] you recall E–Con complaining about the nature and quality of this analytical work being done by the Department of Health?

MR. MARTIN–LEFF: Objection. Same instruction.

MR. YABLONSKI: Do you recall E–Con complaining publicly about the nature and quality of the Department of Health work?

DR. WHALEN: I do not.

MR. YABLONSKI: Do you recall E–Con complaining to EPA about the nature and quality of the Department of Health work?

DR. WHALEN: I do not.

### ITEM # 18

#### Whalen Deposition at page 173

MR. YABLONSKI: Was the basis for your August 2nd order, in part, to avoid the requirements demanded by SEQR?

MR. MARTIN–LEFF: Objection. Deliberative privilege and mental processes principle. I instruct you not to answer.

### ITEM # 19

#### Whalen Deposition at page 192

MR. YABLONSKI: Under the heading conclusions [in Kim Exhibit # 2], the second sentence reads, skin absorption and inhalation of dust from this landfill will be a health hazard to people living in the immediate area, particularly children. Do you know the basis for that conclusion?

MR. MARTIN–LEFF: That is, you're asking whether he knows what the Drs. Kim had in mind when they said that?

MR. YABLONSKI: Right.

DR. WHALEN: I don't know what they had in mind.

MR. YABLONSKI: In your—in your mind is that conclusion supported by the information contained above under the heading background?

MR. MARTIN–LEFF: Objection and instruct the witness not to answer on the grounds of the mental process principle.

### ITEM # 20

#### Whalen Deposition at page 199

MR. YABLONSKI: In the ... same paragraph, the Drs. Kim state—state, although some estimates of air concentrations in basements were made, in order to make an informed judgment as to the toxic threat posed to occupants of these homes, air concentrations in the living space as well as the basement must be measures. *Do you agree* with that?

MR. MARTIN–LEFF: Objection. Instruction not to answer on the same basis as previously stated.

### ITEM # 21

#### Whalen Deposition at pages 201–202

MR. YABLONSKI: Now, what did the Department of Health do to find out where in ring one the people lived?

DR. WHALEN: Well, since they were in each of these places, I'm sure they had an assessment where they were sampling.

MR. YABLONSKI: You're—you're sure, you said. Is that right?

DR. WHALEN: I said I assume.

MR. YABLONSKI: Oh, I'm sorry. I thought you said you were sure.

DR. WHALEN: No.

MR. YABLONSKI: You assume that they did that.

DR. WHALEN: Well, I would think it would be almost impossible to go into a place and take a sample and not know where you were.

MR. YABLONSKI: And if you were told that all of the samples except one were taken in the basement and that the only sample taken in the living room or dining room or anywhere else involved one home, do you believe one could make an informed judgment about the toxic threat posed in that situation?

DR. WHALEN: Depends on the levels.

MR. YABLONSKI: What do you mean it depends on the levels?

MR. MARTIN–LEFF: Objection. I'm going to object to this line of inquiry. Now we're getting into, again, assessment of material that was germane to the policy decisions that Dr. Whalen made, and I'll instruct him not to answer on the grounds previously stated.

MR. YABLONSKI: He answered the question. My question was a follow-up, so it's clear.

MR. MARTIN–LEFF: I understand that.

### ITEM # 22

Whalen Deposition at pages 205–206

MR. YABLONSKI: Who was responsible for the assessment [of certain air samples]?

DR. WHALEN: I would assume Dr. Axelrod in the final analysis.

MR. YABLONSKI: And who—who all was involved in the assessment?

DR. WHALEN: I would think both Dr. Kims, and there may have been—well have been others on Dr. Axelrod's staff.

MR. YABLONSKI: Were these tables the only part of the report that was prepared? That is, was there a narrative section as well?

MR. MARTIN–LEFF: If you recall.

DR. WHALEN: I do not recall.

MR. YABLONSKI: How were the chemicals that are listed here selected for purposes of this assessment?

DR. WHALEN: That I do not know.

MR. YABLONSKI: What exposure pathways were considered and why?

MR. MARTIN–LEFF: I'm going to object to the question on the grounds previously stated. Instruct the witness not to answer.

MR. YABLONSKI: In the study?

MR. MARTIN–LEFF: Excuse me?

MR. YABLONSKI: What exposure pathways were considered in the study?

MR. MARTIN–LEFF: And why. You want to ask—

MR. YABLONSKI: All right. Why—why did the people who were doing the study consider certain—certain exposure pathways?

MR. MARTIN–LEFF: If you're asking whether this witness knows what the opinion or belief of those other people were, I'll permit him to answer.

DR. WHALEN: I do not know.

MR. YABLONSKI: You don't know the answer?

DR. WHALEN: I do not know.

MR. YABLONSKI: Do you know what exposure pathways they did consider?

DR. WHALEN: Inhalation was one.

MR. YABLONSKI: Any others?

DR. WHALEN: I can't state others. I do know inhalation was one.

MR. YABLONSKI: Do you know why that was one that they considered? Was—was that—did inhalation pose the primary risk to the residents at Love Canal?

MR. MARTIN–LEFF: Objection. Same instruction.

### ITEM # 23

Whalen Deposition at pages 208–212

MR. YABLONSKI: Well, Doctor, [with reference to terms used in Kim Exhibit # 4], why don't you explain ... your understanding of aggregate limit or aggregate excess limit?

MR. MARTIN–LEFF: Objection.

MR. YABLONSKI: What's the objection?

MR. MARTIN–LEFF: You're trying—you are asking him to interpret this document or just to give you a general—

MR. YABLONSKI: No, to interpret this. What does it mean here when this refers to aggregate excessive limits?

MR. MARTIN–LEFF: I'm going to instruct the witness not to answer on the grounds previously stated.

MR. YABLONSKI: That's deliberative?

MR. MARTIN–LEFF: Yes.

MR. YABLONSKI: To explain a document that's been released publicly?

MR. MARTIN–LEFF: To explain a document that was or may have, although you haven't laid the foundation, may have been part of his deliberations in reaching conclusions on the health risk at Love Canal.

MR. YABLONSKI: If it was part of his deliberations, then any factual question or any question about what the document means you—you say is—is off—off base?

MR. MARTIN–LEFF: I'm going to instruct the witness not to interpret any of the material that was within the body of the information that he considered in making his policy decisions.

MR. YABLONSKI: Dr. Whalen, do you see the L–6 location?

DR. WHALEN: I'm sorry, where is this now?

MR. YABLONSKI: On table four.

DR. WHALEN: Yes.

MR. YABLONSKI: Going off to the right, the—the column D, it says 0.4 minutes. What does that mean?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: On table six, the last page, allowed UL—it says chloroform, 0.29. What does that mean?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Can you explain table three to me?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Can you explain table two to me?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: What does the term TLV mean?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: What does the term action level estimate mean?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Can you recognize the handwriting on the first page?

MR. MARTIN–LEFF: You may answer.

DR. WHALEN: No.

MR. BRYDGES: Are you going to find out whether this witness relied on the document?

MR. YABLONSKI: Did you rely on this document for any purpose, Doctor?

DR. WHALEN: I'm not certain that we relied on this particular document.

MR. YABLONSKI: So are you saying it's your recollection that—your best recollection is that you did not?

DR. WHALEN: Rely on this particular document.

MR. YABLONSKI: Now, will you permit the question, Gene?

MR. MARTIN–LEFF: I'd like to ask the witness a couple of questions on a preliminary matter.

MR. YABLONSKI: Is this on your time?

MR. MARTIN–LEFF: Yes.

[Conference between Mr. Boote, Mr. Martin–Leff, and Mr. Abrams.]

MR. MARTIN–LEFF: Dr. Whalen, do you recall seeing Kim Exhibit 4 before?

DR. WHALEN: I do not recall seeing this particular Exhibit before.

MR. MARTIN–LEFF: And do you recall, at the time of your deliberations in 1978, seeing calculations on risk of the type contained in Exhibit 4?

DR. WHALEN: I do.

MR. MARTIN–LEFF: I think the record in various depositions is completely clear that there were two or more documents that contain tables of this kind, I think another was Axelrod Exhibit 19, and since it's my understanding that Axelrod 19 was, in fact, presented to Dr. Whalen and was included in his deliberations, and since Kim Exhibit 4 is very similar and contains in some portions exactly the same information, we will assert the privilege on both of those documents irrespective of whether Kim Exhibit 4 was a draft or some modification of what he actually did examine.

MR. YABLONSKI: Doctor, would you look at table four again on Kim Exhibit number 4? Do you know why the authors here included calculations—down at the bottom there's A and B, that is—with—not including benzene and including benzene?

MR. MARTIN–LEFF: Same objection.

ITEM # 24

Whalen Deposition at page 213

MR. YABLONSKI: Table three [is] a list of compounds. Would you tell me which of those compounds is, in your view, it's unlikely there would be a source of—common household product source?

MR. MARTIN–LEFF: Same objection.

ITEM # 25

Whalen Deposition at page 225

MR. YABLONSKI: Now, in the last paragraph on the first page, the author says, the science and art of predicting the human health effects of a chemical after careful study in laboratory animals of that chemical is difficult enough when the exposure is known, when laboratory studies are complete, and when only one chemical is being considered. Do you understand him to be describing risk assessment studies?

DR. WHALEN: Yes.

MR. YABLONSKI: Now, he goes on, and the third line from the bottom says, the extent of exposure is almost completely unknown. Is that a true statement with regard to Love Canal [at the time you were considering the Love Canal situation]?

MR. MARTIN–LEFF: Same objection and instruction.

ITEM # 26

Whalen Deposition at Pages 241–242

MR. YABLONSKI: Now, is [it] true with regard to the numbers that the Department of Health was generating from its air studies at Love Canal [that before you could draw firm conclusions] [y]ou need to know whether there are these solvents and other confounding factors present?

DR. WHALEN: Yes, if you had—well, if we were taking the samples as, to make a gross example, in a paint factory, it would certainly influence your judgment on the results.

MR. YABLONSKI: And without knowing whether there are these other confounding factors present, then, is the data not reliable?

DR. WHALEN: I wouldn't say not reliable. It would depend upon the magnitude of the readings, I would think, among other things, and the frequency of the readings. Although on any individual sample, I think one could raise the question. But I think it would be influenced by the number of samples you had and the magnitude of the readings.

MR. YABLONSKI: Were the magnitude of the readings in any of the ring one homes such that you could draw conclusions from them without knowing whether there were confounding factors present?

MR. MARTIN–LEFF: Objection. To the extent we are now in—and maybe have already been in previous questions but we're clearly now talking about the materials that were reviewed or considered by Dr. Whalen in making his policy decisions, I will object on the mental processes rule and instruct him not to answer.

ITEM # 27

Whalen Deposition at 244

MR. YABLONSKI: Now, would you look at the second page, the second paragraph [of Kim Exhibit 33]? It—it—in there you talk about your ordering the city school district to temporarily delay opening the elementary school. Now, does that refer to the 99th Street School?

DR. WHALEN: Yes, it does.

MR. YABLONSKI: Now, my question is the reason or reasons stated in that paragraph, are those all of the reasons and only the reasons for which you ordered or temporarily ordered the delay of the opening of the elementary school?

MR. MARTIN–LEFF: Objection and instruction not to answer on the grounds of the mental processes rule.

ITEM # 28

Whalen Deposition at page 245

[Mr. Yablonski questioned Dr. Whalen on Kim Exhibit # 33, an August 1978 memo to Tom Frey.]

MR. YABLONSKI: Were you withholding any information from Mr. Frey when you wrote that paragraph?

MR. MARTIN–LEFF: Objection on the grounds of the mental processes rule.

ITEM # 29

Whalen Deposition at pages 247–249

MR. YABLONSKI: Approximately how many homes had been sampled as of August 2, 1978?

MR. MARTIN–LEFF: Objection. This line of inquiry, which attempts to go beyond Exhibit 29 and Kim Exhibit 33, which are rather complete statements of the grounds for a decision that Dr. Whalen makes—made, is in violation of the mental processes rule, and I think the question that you just asked demonstrates why, in part, the Courts are not permitting this kind of examination. You have the underlying data already at hand. You not only have the documentary answers to the questions you're asking this witness, who looked at that material 10 years ago, compared to your having looked at it a week or two ago—you not only have the documentary evidence, you have Dr. Axelrod's testimony, you have the chemists who took the samples, you have the labs who analyzed them, and yet you're trying to go behind an order and plumb the memory of the policy maker on a technical, detailed question, and I'll object to any questions that attempt to go behind this document with that kind of information.

MR. YABLONSKI: So we're clear and we can expedite, you're saying any question asking where the information came from that's in the document or to explain a statement in his order you will instruct him not to answer on the basis of the mental process privilege?

MR. MARTIN–LEFF: I think if there are questions of ambiguities in the language— .

MR. YABLONSKI: I think there is. That's what we're talking about. Selected. I think the word selected is ambiguous, and I'm trying to find out what it means. I think that's a perfectly legitimate question. So I understand you've made your little speech. You either instruct him not to answer or let him answer the question.

MR. MARTIN–LEFF: Okay. I, of course, have objected to that question. In terms of additional questions you might ask, I want you to understand that I will permit questions that simply seek a clarification of language. I don't consider the question about which homes to be a clarification of language. He clarified the language by saying it meant not all but some. That's as far as we'll go in that kind of inquiry.

MR. YABLONSKI: So are you instructing him not to answer the question?

MR. MARTIN–LEFF: I am.

ITEM # 30

Whalen deposition at pages 249–250

MR. YABLONSKI: Okay. Would you turn to the next page? It's 476. Just before the findings of fact, the last two lines there, including information that between 1940 and termination of the Korean War that the Department of Army deposited chemical waste in said Love Canal site—landfill site, where did that information come from, Doctor?

MR. MARTIN–LEFF: Same objection and instruction.

MR. YABLONSKI: Would you turn to the next page, 477? Paragraph number eight, it says, in or about 1953, the site was covered with earth. Where did you get that information?

MR. MARTIN–LEFF: Same objection and instruction.

MR. YABLONSKI: Paragraph number 10 sets forth the ownership of the site and doesn't mention the fact that the state owns a portion of the site. Can you explain why it does not?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Paragraph 13 on page 478. Where did you get that information?

MR. MARTIN–LEFF: Same instruction.

ITEM # 31

Whalen Deposition at pages 253–254

MR. YABLONSKI: Turn to page 182479. There's a table there listing certain compounds, Dr. Whalen, and in the right-hand column, there's a listing that says highest value observed. Do you see that column?

DR. WHALEN: Yes, I see it.

MR. YABLONSKI: Now. of the compounds listed, do you know how many of those highest value observed compounds were found in Mrs. Voorhees' home?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Can you tell me which of the compounds listed in the left-hand column are likely to be attributed to household products, cleaning solvents, fertilizers and the like?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: On the next page, 480, paragraph 21 says, in one home in particular, the concentration of organic chemicals in the living space was well beyond the concentrations measured in the basement of any other house. First, can you tell me what living space that refers to?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Can you tell me which house that refers to?

MR. MARTIN–LEFF: I'll permit—I'll permit that question and the preceding one, since it is more in the nature of clarifying the meaning of the language.

DR. WHALEN: The question is?

MR. YABLONSKI: First of all, which house does that refer to, paragraph 21?

DR. WHALEN: I assume it referred to the Voorhees house.

MR. YABLONSKI: And the words living space, what space, what area of the house does that refer to?

DR. WHALEN: I do not recall.

ITEM # 32

Whalen Deposition at pages 269–270

MR. YABLONSKI: Now, in this Exhibit, Dr. Richards is—is attributed to saying that—especially if you'll note in the second paragraph, that many of the findings reflect the lifestyle of the residents. They put gas, mothballs and other chemicals in the basement.

Is—are those statements consistent with your recollection of what the Department of Health found during its air sampling?

MR. MARTIN–LEFF: Objection, instruction not to answer on grounds previously stated.

MR. YABLONSKI: Did the air sampling studies done at the homes find that readings were affected by gas, mothballs and other chemicals that homeowners had stored in their homes?

MR. MARTIN–LEFF: Same as—objection and instruction.

MR. YABLONSKI: Further on that paragraph, he's speaking of—or the author is speaking of chloroform and 33 parts per billion that they had found, and the next sentence says the warning limit is 50 parts per billion. Do you know whether the Department of Health or anyone else had any warning limits for chloroform?

MR. MARTIN–LEFF: Same objection and instruction.

MR. YABLONSKI: In the fourth paragraph the author says that he stated that paint solvents, rags and gasoline are found in basements, thus benzene and toluene are found in basements. Did the Health Department laboratory people find paint solvents, rags, and gasoline in the basements of ring one or ring two homes?

MR. MARTIN–LEFF: You may answer.

DR. WHALEN: I assume on occasion they may have.

ITEM # 33

Whalen Deposition at page 278

MR. YABLONSKI: ... Were the samples within ring one taken in a systematic fashion?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Okay. Now, in [Exhibit 36], if you look at the right-hand column, second paragraph, and again, it appears to be quoting Dr. Taylor, it says, we're tending to consider benzene and toluene totally unreliable as indicators of chemical migration away from the Canal. My question to you is, did the Department of Health, to your knowledge, reach the conclusion that benzene and toluene were unreliable indicators of migration away from the Canal?

MR. MARTIN–LEFF: Same instruction.

ITEM # 34

Whalen Deposition at page 286

MR. YABLONSKI: ... In the second paragraph, the first sentence says, general conclusions concerning possible hazards associated with exposure to these chemicals and their relationship to Love Canal are unwarranted. Based on what you know of the Department of Health testing, is that an accurate statement?

MR. MARTIN–LEFF: Objection on the grounds previously stated. Instruct the witness not to answer.

MR. YABLONSKI: The third paragraph reads, the circumstances and the origin of exposure, the type of population at risk, the means available of lessening the risk all need to be carefully evaluated before any observations can be made. Is that—do you agree with that, Doctor?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: In the next paragraph the first sentence says, there is also evidence available that chemical levels can be substantially reduced by removing from enclosed areas household products which may—which contain many of the chemicals found in the air. Is that a correct statement?

MR. MARTIN–LEFF: Same instruction.

ITEM # 35

Whalen Deposition at pages 287–288

MR. YABLONSKI: Are you aware of any evidence that the Department of Health developed or any data that the Department of Health developed that chemical levels in the homes could be substantially reduced by removing from enclosed areas household products that might contain chemicals?

MR. MARTIN–LEFF: You may answer.

DR. WHALEN: I wouldn't think one would have to do a study. I would think that would be common sense. Commonly agreed to.

MR. YABLONSKI: The last sentence in that same paragraph says, in some basements, levels of chemicals in the air declined dramatically after removal of these products. Do you recall that that's what the Department of Health found?

MR. MARTIN–LEFF: Instruct the witness not to answer with respect to pre-August data.

MR. YABLONSKI: Why pre-August?

MR. MARTIN–LEFF: You may—you may answer with respect to any subsequent studies that were not part of your decision in August of '78, if you recall any.

MR. YABLONSKI: Well, I'm going to ask the question, now, and—and I want the witness to answer my questions, not yours, Gene. I have the right to ask the questions. You either instruct the witness not to answer or make your objection or let him answer.

My question, Dr. Whalen, is did the Department of Health ever find that the levels of chemicals in the air in the Love Canal area homes declined dramatically after removal of products that had chemicals in them?

MR. MARTIN–LEFF: I'll instruct you not to answer with respect to data obtained before August 2nd, 1978. You may answer apart from that restriction.

DR. WHALEN: I have no specific recollection.

ITEM # 36

Whalen Deposition at pages 288–289

MR. YABLONSKI: Now [I] hand you a document marked as Whalen Exhibit 39, which is a letter from Dr. Axelrod to Bernard Goldstein, November 22, 1978, document 933231.

DR. WHALEN: Yes.

MR. YABLONSKI: Now, in the last two sentences of the second paragraph of his letter, Dr. Axelrod says, as you probably gathered from the presentation of the data, the concentration of benzene was generally not at a high level, except in the immediate vicinity of the Canal proper. In those cases where we did determine high values in the homes, they appeared to be related to the storage of gasoline or of oil in the basements of the affected homes.

Is Dr. Axelrod's statement there consistent with what the Department of Health data showed?

MR. MARTIN–LEFF: I'll instruct the witness not to answer on the grounds previously stated.

ITEM # 37

Whalen Deposition at pages 319–321

MR. YABLONSKI: You gave us [in Exhibit 44] a list of decisions.

DR. WHALEN: Right.

MR. YABLONSKI: Now, as I heard those, and I want you to correct me if I'm wrong—

DR. WHALEN: Right.

MR. YABLONSKI: —they were all based upon epidemiology data or health effects data; is that correct?

MR. MARTIN–LEFF: He didn't testify to that, and I'm going to object to inquiries about the basis of his decisions. You asked him not the basis of his decision but what the content of his decisions were.

MR. YABLONSKI: I asked him what decisions he made in that area, and he listed a number of decisions.

MR. MARTIN–LEFF: One of which was temporary relocation of pregnant women and small children.

MR. YABLONSKI: Yes. Was that based on epidemiology and health data?

MR. MARTIN–LEFF: That's the end of the question?

MR. YABLONSKI: Yes.

MR. MARTIN–LEFF: Objection, instruction not to answer.

MR. YABLONSKI: Why?

MR. MARTIN–LEFF: You're plumbing the thought processes of the primary policy decision, and the same rationale for my earlier objections in this deposition applies to this.

MR. YABLONSKI: I disagree with—with—with the fundamental premise, but in any event, it seems to me that by delivering this speech after he left the health—the—the Health Department employ and stating all of these things entitles me to ask all these questions based on this document, and that's what I'm doing.

MR. MARTIN–LEFF: Well—

MR. YABLONSKI: You were the one who raised the issue about what decisions he was talking about in this document, and so I'm asking him what decisions he was talking about. And he gave me a list, and now I just want to clarify as I heard it, that all of those decisions were based on—let me ask the question another way.

Did you—did you make any decisions in the area of health risk or threat to health based on the level of chemicals found in the air of ring one homes?

MR. MARTIN–LEFF: Same objection and instruction.

MR. YABLONSKI: Did you make any decisions as you refer to the—refer to them in this Exhibit 44 based on chemical data at Love Canal?

MR. MARTIN–LEFF: Same objection and instruction.

ITEM # 38

Whalen Deposition at page 323

MR. YABLONSKI: Did you have a large number of people at Love Canal?

MR. MARTIN–LEFF: Objection. Same instruction.

ITEM # 39

Whalen Deposition at pages 326–328

MR. YABLONSKI: Now, in the last paragraph, you say your job was—then was to marshal the extra resources these professionals needed, et cetera, and finally to utilize the findings to guide the health aspects of decision-making. What findings of the professionals were you referring to there?

DR. WHALEN: Their laboratory—

[Conference between Mr. Abrams and Mr. Martin–Leff]

MR. MARTIN–LEFF: Well, two problems. One, the findings refer back to the previous paragraph, which includes the advice from outside the Health Department. We, as you know, assert a privilege with respect to the reports from the blue ribbon panel.

Second, the question as to the findings that guided the health aspects of Dr. Whalen's decision-making goes to his mental processes, and I will instruct him not to answer on both of those two grounds.

MR. YABLONSKI: Would you turn to page four? In the second paragraph you say, finally and most importantly, I had to recognize that the scientific findings would probably not lead to an unequivocal conclusion. What scientific findings were you referring to there?

MR. MARTIN–LEFF: Same objection and instruction.

MR. YABLONSKI: What did you mean by would probably not lead to an unequivocal conclusion?

MR. MARTIN–LEFF: Same objection— well, no. The deliberative privilege, mental process rule is the basis of our instruction in this case.

MR. YABLONSKI: What did you mean by many of the decisions would be based on prudence, which of necessity went beyond the scientific evidence?

MR. MARTIN–LEFF: Same instruction.

### ITEM # 40

Whalen Deposition at pages 356–357

MR. YABLONSKI: ... [Y]ou referred to studies to determine whether there was a likelihood of inhalation. What did those studies conclude?

MR. MARTIN–LEFF: Objection. Mental processes and instruct the witness not to answer.

MR. YABLONSKI: Did those studies find that inhalation was a route of exposure?

MR. MARTIN–LEFF: Same instruction.

MR. YABLONSKI: Did the Department of Health ever determine whether Love Canal area residents were ingesting chemicals from the Canal through the consumption of garden vegetables or products?

MR. MARTIN–LEFF: Steve, you can have a continuing record offer of proof, if you want to call it that. I don't think there's a need to ask additional questions in this line, just as we were able to shortcut the earlier portion of the deposition.

MR. YABLONSKI: So you're going to instruct him not to answer all of these questions?

MR. MARTIN–LEFF: I'll instruct him not to answer questions that go to the interpretation of data or his reliance on particular information that might have led to his policy decisions.

MR. YABLONSKI: I'm not asking him to interpret or ... his reliance on anything. I'm asking a fact question, what, if anything, did the Department of Health find in its studies, inhalation and consumption of— of garden vegetables.

MR. MARTIN–LEFF: I will note for the record that we will object to questions of that nature.

MR. YABLONSKI: And instruct not to answer.

MR. MARTIN–LEFF: Exactly.

### ITEM 668

## SUPPLEMENTAL RULINGS OF THE SPECIAL MASTER RELATED TO THE APRIL 30, 1988 RULING ON THE MENTAL PROCESSES PRIVILEGE

(Filed May 27, 1988)

Pursuant to my April 30, 1988 Ruling on the Mental Processes Privilege, the State now has submitted for *in camera* review proffers of proof addressing several specific instances where the parties disagree over the application of the mental processes privilege. Each proffer identifies (for the specific instance at issue) the decision which was the product of the deliberative process creating the claim of privilege, describes the deponent's role in that deliberative process, and outlines the substance of the deponent's testimony. Based upon the State's proffers, I now make the following supplemental rulings.

*Item # 2*

The deliberative and mental processes privileges apply. The questions which are not answered probe what Doctor Whalen did or would have done with data in the pre-decisional deliberative period.

*Item # 4*

The mental processes privilege applies. The State's proffer makes clear that the

question probes Doctor Whalen's views in the pre-decisional deliberative period.

*Item # 10*

The mental processes privilege does not apply. As I have indicated, so long as a question seeks merely the deponent's *final* but unwritten view, the privilege is inapplicable. Once the decisionmaker has come to rest, the deliberative process is complete. As the State's proffer relates the April 25, 1978 directive to the information sought (Doctor Whalen's reasons for writing it), the information sought is merely part of his *final* view on the matter.

*Item # 13*

The State has withdrawn its objections to the questions.

*Item # 23*

With one exception, neither the deliberative privilege nor the mental processes privilege applies to the disputed questions. The one exception is the very last question ("Do you know why the authors here included calculations ..."), to which the deliberative privilege applies because the question asks the decisionmaker to state the motives of subordinates.

Except for this very last question, the disputed questions seek merely Doctor Whalen's own present understanding of the document and terms used in it. Neither the deliberative privilege nor the mental processes privilege precludes such questions. Those privileges do preclude inquiry into whether Doctor Whalen's own present understanding of the document and terms used in it comports with or is derived from his or others' understanding of those matters in the pre-decisional deliberative period. As I indicated in my April 30 Ruling, the possibility that someone might attempt to infer a deponent's pre-decisional views from a statement of the deponent's present views does not justify application of either the deliberative privilege or the mental processes privilege to present views.

*Item # 24*

The mental processes privilege does not apply. The disputed question seeks merely Doctor Whalen's present views.

Given the State's proffer, it is clear that the exception to the deliberative privilege requiring the disclosure of purely factual material does not apply.

---

The State asks that I consider whether my ruling that most of the disputed questions in Item # 23 are not privileged is inconsistent with my ruling that the first disputed question in Item # 22 is privileged. In the State's view, all of the disputed questions in Item # 23 and the first question in Item # 22 share a characteristic which makes them identical for our purpose—they all "sought to obtain from a decisionmaker an explanation for scientific analysis carried out by subordinates."

The State's description of the questions is incomplete—and, in my view, it misses the key distinction between the questions to which the privileges apply and those to which they do not. The two questions to which the privileges apply are the first disputed question in Item # 22 ("Do you know why that was the one that they considered?") and the last disputed question in Item # 23 ("Do you know why the authors here included calculations ..."). Each of these questions seeks much more than Doctor Whalen's own explanation or interpretation of the document; each asks him to state the motives of his subordinates. Such material is protected by the deliberative privilege. The questions to which the privileges do not apply seek only Doctor Whalen's own present explanation or interpretation of the document. Such material is not protected by either the deliberative privilege or the mental processes privilege.

John Sexton
John Sexton
Special Master

May 25, 1988

